42 N.J. Super. 405 (1956)
126 A.2d 892
DAUGHTERS OF MIRIAM HOME FOR AGED AND INFIRM, CONGREGATION ADAS ISRAEL, A RELIGIOUS CONGREGATION, AND TIFERIS TZVI HEBREW SCHOOL, PETITIONERS,
v.
LEGALIZED GAMES OF CHANCE CONTROL COMMISSION, DEFENDANT. STATE GARDEN (A CORPORATION), PETITIONER,
v.
LEGALIZED GAMES OF CHANCE CONTROL COMMISSION IN THE DEPARTMENT OF STATE, ATTORNEY-GENERAL OF THE STATE OF NEW JERSEY, JAMES J. ZUCCARO, CHIEF OF POLICE OF THE CITY OF UNION CITY AND CITY OF UNION CITY, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 22, 1956.
Decided November 16, 1956.
*407 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. Joseph M. Jacobs argued the cause for Daughters of Miriam Home for Aged and Infirm, Congregation Adas Israel and Tiferis Tzvi Hebrew School, petitioners (Messrs. Stoffer and Jacobs, attorneys).
Mr. Leo Solomon argued the cause for State Garden, petitioner (Messrs Solomon & Solomon, attorneys).
Mr. David M. Satz, Jr., argued the cause for defendants (Mr. Grover C. Richman, Jr., Attorney-General).
The opinion of the court was delivered by CLAPP, S.J.A.D.
These two proceedings for declaratory judgments have been joined for argument. Each was instituted in this court on petition under R.R. 4:88-10 for the purpose of challenging the validity of the following four rules promulgated by the Legalized Games of Chance Commission:

"RULES AND REGULATIONS PART VII
* * *
20. No organization shall hire premises for the holding, conducting or operating of a bingo game except from a qualified organization registered with the Control Commission.
*408 21. No person, firm or corporation, except a qualified organization registered with the Control Commission, shall let or offer to let premises for the holding, conducting or operating of a bingo game.
22. All moneys received for the rental of premises for the holding, conducting or operating of a bingo game must be used exclusively for authorized purposes.
23. No fee for the rental of premises may be paid by any licensee to itself, to its trustees, to a committee of the licensee, or to any organization whose members are the same or substantially the same as the licensee."
One petition is filed by a charity and two religious organizations, all licensed by the City of Passaic under N.J.S.A. 5:8-25 to conduct bingo games. None of them owns premises adequate for the purpose. However, they and other licensees each run a bingo game once a week, either in the afternoon or evening, at "Bingo Hall" located on the second floor of a building in Passaic, New Jersey. They lease it for that purpose from Passaic Auditorium Corp., Inc., a corporation organized in April 1954 (the Bingo and Raffles amendment to the New Jersey Constitution was adopted by the people November 3, 1953), which in turn leases the second floor from the owner of the building. An analysis of the proceeds received from bingo games conducted at Bingo Hall for a period of six months discloses that the rents plus janitorial fees paid Passaic Auditorium Corp., Inc., totalled $1,000 more than what the licensees themselves received from the game. Moreover, it appeared that on every occasion during the period, except three, the maximum prize of $1,000 was awarded. It may be noted, too, that the secretary of the corporation, though he holds 25% of the stock, does not know who the principal stockholder is.
The other petitioner, State Garden, a corporation, subleases a hall in Union City which can accommodate 1,000 players. Like Passaic Auditorium Corp., Inc., it rents to various licensees, each regularly once a week. However, it also uses its hall for certain other purposes.
We conclude (as will appear herein) that we need deal in this opinion only with Rule 20. Consideration is *409 given, first, to petitioners' contention that the rule is unreasonable and therefore invalid. The burden of proof on the issue falls on petitioners.
The Constitution of New Jersey, Art. IV, Sec. VII, par. 2, as amended November 3, 1953, permits bingo and raffles, but only
"when the entire net proceeds of such games of chance are to be devoted to educational, charitable, patriotic, religious or public-spirited uses * * *." (Italics added)
Furthermore, in dealing with bingo, the Constitution makes it mandatory upon the Legislature to prescribe "restrictions and controls"; and in dealing with raffles, it invests the Legislature with an authority to like effect. In pursuance of this mandate and authority, the Legislature created the respondent Commission and, in imperative terms, laid upon it the following duty (N.J.S.A. 5:8-6):
"It shall be the duty of the commission to supervise the administration of the Bingo Licensing Law and the Raffles Licensing Law and to adopt * * * rules * * * governing * * * the holding, operating and conducting of games of chance * * * which shall have the force of law * * *, to the end * * * that said games of chance shall be fairly and properly conducted for the purposes and in the manner in said laws prescribed and to prevent the games of chance authorized to be conducted by said laws from being conducted for commercial purposes instead of for the purposes authorized in said laws * * *." (Italics added)
It is important to the decision here to bear in mind the Commission's views (expressed in its findings in this case) with respect to the commercialization of bingo:
"* * * the game [of bingo] is tolerable only when conducted on a moderate scale * * * it is harmful when conducted as a commercial enterprize or as an end in itself, or when it grows to such a size that it is a significant factor in the economic or social life of the community, or when, by its size or by the manner of its conduct or otherwise, it tends to foster or encourage the gambling instinct."
It is not to be overlooked, either, that the Legislature in N.J.S.A. 5:8-33 prohibits any licensee from conducting *410 bingo games "oftener than on 6 days" a month. Can it be said that the operation of such games repeatedly during the week at a commercial bingo hall, comports with the underlying purposes of that statute, even though no licensee hires the hall more than one afternoon or evening a week?
In passing upon the reasonableness of Rule 20 we must take into account the concern of the public in maintaining proper controls, as evidenced indeed by the terms of the constitutional amendment itself. We must take into account, too, the specific concern of the Legislature in preventing the commercialization of bingo and raffles. These demands, that safeguards be thrown around an operation that had prior to the constitutional amendment been a crime, bring to mind like demands made with respect to the sale of alcoholic beverages when, following the Twenty-First Amendment to the United States Constitution, it, to a certain extent, ceased to be a crime. In each of these cases social dangers, inherent in the operation, X-L Liquors, Inc., v. Taylor, 17 N.J. 444, 449 (1955), evoke the concern of the law.
With these considerations in view, we turn to the Commission's findings in this proceeding. They may be summarized as follows:
1. The commercial lessor, which seeks to rent its hall to various organizations repeatedly during the week, strives to build up a regular bingo patronage which a single organization could not have secured because of the statute (N.J.S.A. 5:8-33) prohibiting it from conducting a game oftener than six days a month. Licensees are tempted to lease these commercial halls even though they have suitable halls of their own; for they hope thereby to raise large sums of money. Besides, they could not otherwise compete with commercial halls in their locality, for commercial halls tend to drain away patronage from other games in the locality.
2. The commercial lessor seeks to stimulate not only a regular patronage, but a large scale attendance, consisting, for the most part, of avid bingo fans, who are attracted to the games by the offering of the maximum prize ($1,000 on an occasion). Only, to an insignificant extent, are supporters of the sponsoring organization found in the audience. It is sought to build up (what has been called) "big business bingo" despite any variant policies suggested by the stringent restrictions against advertising (N.J.S.A. 5:8-36). Of *411 course, the large attendances bring large profits which in turn serve to justify high rentals.
3. The commercial lessor often is run by, or has connected with it, persons with a long experience in bingo operations. There is grave danger of a tendency on the part of commercial lessors to supervise and guide bingo operations in commercial halls; indeed, some of them clearly participate directly in matters of policy and provide operating assistance.
4. The funds taken in at a bingo game are in cash, making verification of receipts and expenditures an extremely difficult matter and creating opportunities for undisclosed transactions. Added to these dangers is the fact that the commercial lessor frequently assists in filling out the reports of operations. At times such a lessor has provided cash for a bank at the games, and furnished the lessee with gambling paraphernalia, tables, c. irs, janitor service, etc., sometimes making more or less arbitrary charges for the same.
5. Rental arrangements are oral, informal and fluid, and rentals fluctuate according to attendance, thus enabling the lessor to share with the licensees the profits of the games. In fact, the sums paid the commercial lessors amounted in most cases to more than that received by the licensees. A substantial number of the licensees thought the rentals were too high but felt helpless to do anything about the matter. Passaic Auditorium Corp., Inc., received rentals of about $36,000 a year for the renting out of Bingo Hall, Passaic, even though the rent it paid its own landlord came to only $12,000 a year.
6. State-wide regulation of rentals seems to be wholly impracticable without in some way making the commercial lessor a partner in the bingo operation, thus giving him a direct interest in stimulating the attendance. Indeed, it is thought that any attempt to permit commercial leasing, by regulating the amount of the rental according to some formula, would only result in the mushrooming of commercial halls.
7. In August 1955 it appeared that commercial renting was spreading throughout the State and that steps were necessary to protect unsuspecting organizations. Hence the above rules were adopted.
In its conclusions the Commission notes that of 4,757 organizations registered with the Commission up to January 19, 1956, 860 have engaged in bingo at one time or another. Yet only about 24 organizations leased premises in September 1955 (although earlier in 1954, apparently 45 licensees rented premises, 15 of them from so-called commercial halls).
In the early part of 1956 when testimony was being taken before the Commission in these proceedings (pursuant to R.R. 4:88-11), bingo games were being conducted in Bingo Hall four nights and one afternoon each week, and in State *412 Garden three nights a week (although they had been conducted four times a week in State Garden at the time the four rules were promulgated). The case before us is focused on situations such as these, namely, of lessors seeking to rent their halls repeatedly during the week for the operation of bingo games. There has been no clear attempt to attack Rule 20, or to sustain it, except in that regard. For instance, petitioners renting Bingo Hall have not established that they could not lease adequate premises on a reasonable basis from a licensee. There are other situations that may raise problems, but we need not specify them.
Under the circumstances, though we would have preferred to have dealt with the rule more broadly in the interests of disposing of all questions, we have decided to limit our decision to the problem put before us. Accordingly, we shall hold that the rule, insofar as it prevents leases from non-licensees in the circumstances presented by petitioners, is not unreasonable. The rule, in those circumstances, rests in essence upon the finding of the Commission that such leases serve to thwart the legislative mandate against the conduct of the games "for commercial purposes" (N.J.S.A. 5:8-6).
We come next to the point on which petitioners put much stress, namely, that Rule 20 must be declared invalid because it conflicts with the amendments to N.J.S.A. 5:8-26 and 5:8-34, found in L. 1955, c. 160. Petitioners' argument calls first for a consideration of the Commission's special report to the Legislature dated March 16, 1955. The report deals almost entirely with the evil of commercial bingo halls, and indeed makes specific reference to the situation existing at Bingo Hall, Passaic. It recommends amendments to the Bingo and Raffles Laws that had been discussed with the Joint Legislative Commission (established under Senate Concurrent Resolution 18, 1954), providing for the rental of equipment by licensees only from "sources" approved by the respondent Commission and at "rates" approved by it (see L. 1955, c. 161 amending N.J.S.A. 5:8-52, and L. 1955, c. 162 amending N.J.S.A. 5:8-6, *413 which are not referred to by the parties). Then, in the next sentence, the report makes the following further recommendation (which, so far as appears, had not been discussed with the Joint Legislative Commission):
"In view of the situation recited above [with respect to commercial bingo halls] we recommend that the laws be further amended to include similar provisions concerning the rental of premises for the conducting of bingo games."
This is to be taken as a recommendation that the Commission be given statutory power to approve "rates" of rentals of premises and "sources" of leaseholds. It might be observed at this point that the Commission now regards as altogether infeasible any proposal it may then have made that the Legislature give it power to regulate "rates" of rentals. And it may be noted, too, that any power the Commission may then have sought, enabling it to approve the "sources" of leaseholds, is rather casually worded and indeed appears hardly to have been thought through.
In any event, shortly thereafter, namely, on May 9, 1955, Senate Bills 303-305 were introduced in the Senate of New Jersey, and on July 21, 1955 they were enacted as L. 1955, cc. 160-162. The bills cover a wide variety of matters affecting bingo and raffles, including two provisions on which petitioners' argument depends and which doubtless were added to the bills because of the Commission's report of March 16, 1955:
1. The first of these provisions (L. 1955, c. 160, § 3, amending N.J.S.A. 5:8-26) contains this direction to the applicant for a bingo license: "In event" he intends to lease "any premises" from "any person, persons or corporation" for the operation of bingo games, he must submit with his application a statement sworn to by the lessor, if an individual, or on behalf of the lessor, if a corporation, setting forth the amount of the rent to be paid and setting forth also:
"that such lessor or lessors, or if a corporation all of its officers and each of its stockholders who hold 10% or more of its stock issued and outstanding, are of good moral character and have not been convicted of crime."
It is not apparent just how this provision would in any efficient way obviate the objectionableness of a commercial bingo hall.
*414 2. L. 1955, c. 160, § 5, amending N.J.S.A. 5:8-34, forbids payment of any rental not set forth in the statement or of any rental in excess of the amount so set forth.
One month after these two 1955 statutory provisions were enacted, the Commission adopted the four rules, above set out.
Petitioners bear down on the words of the provision above referred to (L. 1955, c. 160, amending N.J.S.A. 5:8-26), which requires lessors to make statements. It was urged on petitioners' behalf, particularly on the oral argument, that this provision indicates that the class of lessors comprises "any person, persons" or a corporation issuing stock  membership corporations seem to have been overlooked (however see "person," N.J.S.A. 1:1-2. Licensees, where incorporated, would only very rarely be stock corporations. Cf. N.J.S.A. 15:6-1; 14:11-16. Cf., further, N.J.S.A. 33:1-25). This, it was said, indicates a definite legislative intention that persons and stock corporations  those who could not qualify as licensees  are to be permitted to act as lessors. Incidentally, one of the petitioners claimed that this provision deals only with such persons and corporations who could not qualify as licensees. We will have something to say later on this last point; it seems rather to work against petitioners' whole argument.
In reaching our decision, we start with this postulate: we deem it to be fairly clear that Rule 20 (i.e., insofar as the rule deals with commercial bingo halls, as above stated) lay within the scope of the Commission's rule-making power prior to the enactment of the two 1955 statutory provisions cited. Indeed petitioners, though they have briefed the case with much care, offer no argument to the contrary. The question before us then reduces itself to this: did the Legislature intend to take away that power by enacting these two provisions? Did it intend to give individuals and corporations, who could not qualify as licensees  in particular, did it intend to give operators of commercial bingo halls  a right, sanctioned by it, to act as lessors? Is such an intention implicit in the legislative language?
*415 The petitioners have the burden of establishing that this was palpably the legislative intention. For an administrative rule is presumptively valid and will not be rejected as inconsistent with a statute, unless the inconsistency is palpable. Grenewicz v. Ligham, 34 N.J. Super. 1, 9 (App. Div. 1955); Lane v. Holderman, 40 N.J. Super. 329, 335 (App. Div. 1956); Boske v. Comingore, Ky., 177 U.S. 459, 470, 20 S.Ct. 701, 44 L.Ed. 846, 850 (1900). In our opinion, petitioners have not sustained this burden.
We are, as we say, concerned with the legislative intention embodied in the two 1955 statutory provisions cited. Where there is any doubt on the matter, we search for that intention in the spirit and policy of the statute. Caputo v. Best Foods, Inc., 17 N.J. 259, 264 (1955). It seems indeed to be true that these two provisions were enacted by the Legislature in response to the concern, exhibited by the Commission in its report of March 16, 1955. As already indicated, the Commission was concerned with the potential commercialization of bingo through rentals of premises from persons who in fact are engaged (either themselves or through their associates) in the artificial stimulation of public interest in the gambling aspect of the pastime for their own financial gain. It would indeed be strange if the Legislature's response to the problem was to require the continuance of commercial bingo halls.
On behalf of State Garden it was contended on the oral argument that the statutory provision, calling for affidavits from any person, persons or stock corporation acting as lessor, indicates that the Legislature had in mind only leases made by non-licensees. There is something to be said for this. Why should the Legislature have required an affidavit as to the amount of the rental, the good character and the lack of a criminal record of the members and officers of the lessor, when a qualified organization acts as such? We may then, arguendo, concede the validity of State Garden's contention. However, it will appear after reflection, that this contention works rather against petitioners' argument. For one might conjecture, not without reason, that *416 when the Legislature enacted the statutory provision referred to, it in effect said to the Commission: we have delegated to you the power to avert such abuses as these; we do not now say to you what you should do about the matter; but there may be a question whether you have power to regulate directly lessors who are not licensees, and to require affidavits from them, cf. Kravis v. Hock, 136 N.J.L. 161, 163 (E. & A. 1947); in any event, if you do allow any premises to be leased (viz., L. 1955, c. 160, amending N.J.S.A. 5:8-26: "In event that any premises * * * is [sic] to be leased") from such lessors, we, endeavoring to be of aid in the matter, are invoking our plenary powers and shall require such lessors at least to file certain affidavits. In short, petitioners' argument, if projected in this fashion, comes down to a legislative observation much to this effect: you, the Commission, have the power to do as you will with licensees who attempt to lease commercial bingo halls; but if you do allow licensees to enter into such leases, we shall require the lessors to file the affidavits mentioned.
It must be remembered that the Commission in its report of March 16, 1955 did not recommend two courses of action: it did not recommend on the one hand, outright prohibition of commercial bingo halls and, on the other hand, approval of "rates" of rentals and of "sources" of leaseholds. There is no basis here for saying that the Legislature by implication rejected a proposal calling for the prohibition of such halls, and instead enacted its own prescription for the evil, namely, of merely requiring affidavits from lessors. Indeed so far as appears, the idea underlying Rule 20 did not occur to the Commission, or to the Legislature or any one else, until after the enactment of the 1955 statutes cited.
The fact that the Commission adopted the rules so soon after the enactment of the statutes certainly does not aid petitioners' position. For we will not presume that the respondent Commission  which no doubt was sensitive to the action of the Joint Legislative Commission on Bingo and Raffles, and intimately conversant with the thinking that led to L. 1955, cc. 160-162  set about, one month *417 after these acts became law, to flout the Legislature by proceeding inconsistently with the legislative purposes.
We are satisfied that one of the key provisions of our statutes affecting bingo and raffles (N.J.S.A. 5:8) is the clause seeking to prevent the commercialization of the games; we are satisfied, too, that the Legislature in enacting the implementary laws of 1955 did not intend to alter that policy. That being so, we cannot suppose that, as petitioners argue, the Legislature set about affirmatively to sanction the continuance of commercial bingo halls. Nor, having regard for the spirit of these laws, can we accept petitioners' assertion that Rule 20 is subversive of legislative policy. The direction of the legislative intent is not entirely clear. However, the conclusion we have reached does, we think, harmonize with the overall purposes of the Legislature. Certainly it cannot be said to be palpably inconsistent therewith.
The arguments that the rules deny due process and equal protection of the laws and that they establish an arbitrary classification of qualified lessors, discriminatory to such lessors as the State Garden, are rejected. We dismiss cursorily also the further question, whether under the rules licensees would jeopardize their tax exemptions if they rented their properties; that matter certainly should not be dealt with here. As to corporations subject to Title 15, see N.J.S.A. 54:4-3.6, as amended.
A question has been raised as to the validity of Rule 21 on the ground that the Commission cannot directly regulate third persons, including individuals and stock corporations, acting as lessors; the contention is that it can deal with them only by direct regulation of licensees. Cf. Kravis v. Hock, 136 N.J.L. 161, 163 (E. & A. 1947). However, as above stated, we have concluded that Rule 20 prevents qualified organizations, registered with the Commission, from leasing premises from commercial bingo halls repeatedly during the week; and in view of that conclusion it would seem, so far as we have been informed, that Rule 21 would be superfluous and would present no further problem with *418 respect to such leaseholds. In any event we are not advised of any such problem. We therefore do not need to pass on the point of law that has been raised.
Rule 22, requiring registered organizations which receive rents from other organizations to apply them exclusively to authorized purposes, is in no way involved in the present case. Even more obviously Rule 23 is not involved here. No attempt has been made by petitioners to show that they have any grievance under these two rules.
A declaratory judgment may be submitted sustaining Rule 20 insofar as we deal with it, namely, insofar as it affects petitioners.