ELIZABETH LODGE No. 289, B.P.O.E., APPELLANT, v. LEGALIZED GAMES OF CHANCE CONTROL COMMISSION, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued January 16, 1961—Decided April 28, 1961.

240

Before Judges PRICE, GAULKIN and SULLIVAN.

*Mr. John F. Ryan* argued the cause for appellant (*Messrs. Ryan, Saros, Davis & Stone,* attorneys; *Mr. Ryan,* of counsel).

*Mr. G. Douglas Hofe, Jr.,* Deputy Attorney General, argued the cause for respondent (*Mr. David D. Furman,* Attorney General of New Jersey, attorney and of counsel; *Mr. Hofe,* on the brief).

The opinion of the court was delivered by

PRICE, S. J. A. D. Appellant Elizabeth Lodge No. 289, B.P.O.E. (Lodge), pursuant to *R. R.* 4:88–8(*a*), challenges the propriety of the action of respondent Legalized Games

of Chance Control Commission (Commission), adjudging that the Lodge was guilty of violating the provisions of *N. J. S. A.* 5:8–25, and revoking its bingo and raffles licenses.

Specifically, the Commission determined that in conducting a licensed bingo game on February 23, 1960, the Lodge had violated *N. J. S. A.* 5:8–25 in that the "caller" at the game and the workers assisting him had failed "to call the balls as they were drawn from the blower, but in fact returned balls to the blower receptacle without calling them and announcing them over the loudspeaker system." The Commission further determined that the Lodge had "interfered with an Investigator of this Commission carrying out his duties assigned to him" under *N. J. S. A.* 5:8–6 and that "representatives" of the Lodge had "threatened the Investigator with bodily harm * * *."

Following a hearing the Commission, on April 15, 1960, ordered that "all outstanding licenses" issued to appellant "or to any Auxiliary thereof" be "revoked; said revocation to commence on May 1, 1960," and that appellant "and any Auxiliary thereof" be declared "ineligible to apply for a bingo or raffles license for a period of 18 months." We granted a stay of the Commission's order pending disposition of the present appeal.

The Lodge contends that (a) the evidence submitted did not justify the Commission's action, and (b) the revocation of appellant's "Raffles License" as well as its "Bingo License" was "illegal and erroneous and constituted an abuse of discretion."

The gist of the first charge against appellant is that on the night in question the operator, instead of drawing one of the balls, which had been discharged from the receptacle into a chute, and then calling the number on it, would occasionally lift the chute, operated on a swivel, and return the balls in the chute to the receptacle. It is significant that the record reveals no charge against appellant of fraud, dishonesty or favoritism in the conduct of the game. In fact, the brief submitted on behalf of the Commission con-

tains the statement that "it appears to be the custom that balls are in fact 'dumped' in this manner in the discretion of the operator in response to calls from players of 'shake them up,' occasioned by the calling of successive numbers which appear to the audience not to be at random."

A woman who had frequently attended the Lodge's bingo games complained that the criticized procedure had been followed by the Lodge on other occasions. Her complaint led to the attendance of a Commission investigator on the night in question.

At the hearing before the Commission the investigator testified that during the course of the evening he noticed instances of a course of action which he characterized as irregular. On the "fifth" time it occurred he interrupted the play, identified himself, and refused to permit the particular Lodge member, who had been taking the balls from the chute, to continue. Arguments between Lodge members and the investigator ensued, initially in the main room and later in an adjoining room. The game, meanwhile, continued with a single operator. Allegedly, opprobrious epithets were directed by Lodge members to the investigator. It was asserted by the investigator that some of the members, who had been operating the game, refused to disclose their names on his request and rejected his repeated demand that they give him a written description of their method of operation although, he said, they had, at the inception of the controversy, promised to do so. Lodge members testified that the investigator, at the discussion in the adjoining room, accused them of "finagling" the balls and, when they refused to accept that word as descriptive of the game's operation, the argument became intense and acrimonious. The investigator claimed that some of the members had curtly told him to leave, threatening to call the police if he did not do so. He finally left without obtaining any written statement.

Bingo games had been conducted by the Lodge since 1954. There were, at times, as many as 400 to 500 participants

at the weekly sessions. Description of the events on February 23, as related by the Lodge members, was in contrast with that given by the investigator. The Lodge members immediately concerned with the game's operation testified that on the night in question the argument stemmed from the fact that, when the game was stopped by the investigator, the principal operator had agreed to give the investigator a statement that occasionally he was "dumping" the balls back into the blower (a practice which appellant asserted was proper and which, as above stated, the Commission admits was common practice when members of the audience called for a recirculation of the balls), but that the investigator wanted a signed statement that "manipulation" was taking place. Such statement, they said, was refused because it implied a dishonest operation which implication, they asserted, was wholly unjustified.

The woman who, as aforesaid, instigated the instant "under cover" investigation, testified at the Commission hearing as follows:

"Q. In other words, your complaint was that more than one ball came out or they did not take the ball that came out? A. That's right.

Q. What was it? A. Two balls came out and one was put back, that's what I noticed. I don't think it's fair.

Q. How many times did you observe that happen? A. I have seen that done a couple of times.

Q. During that evening? A. That's right.

Q. Did you hear anyone say or hear them say, 'shake them up'? A. I have heard that in the audience.

Q. There at that time? A. Yes."

The investigator testified that when he attended on February 23, he observed that the operator who drew the balls from the chute "would finger the balls as they would come out of the chute." He added:

"* * * and it seems to me, well, he would dump, lift the chute and the balls would go back into the blower. The first time I saw that he did it two or three times before he actually took a

ball out to show it to the caller, so that he could call the number. * * * I think it was on the fifth time he did it, he actually pulled the ball out and showed it to the caller who called the number. * * * At that particular time there were seven winners on that one game."

The investigator further testified that he then proceeded to the stage, identified himself and told the Lodge member who seemed to be "in charge of the game" that he was "fingering the balls." He added: "I asked him why he was doing that, why he didn't pick the balls out as they came and called [*sic*] it." One of the other members, he said, replied that "it was all right for them to do that because people holler 'shake them up' and they throw the balls back in." Further interrogation of the investigator by a member of the Commission who sought a more definite statement of the operation was answered as follows:

"* * * Well, there is a blower which contains 75 balls numbered consecutively from 1 to 75, it is operated by an air blower and it circulates the balls around this blower and in turn there is a chute, I imagine, oh, around five or six inches long. I think there's three balls that land in that chute and come out, and the caller can actually pull one ball out at a time. The first ball in the gutter he would finger and spin it around to see what number it was and he would dump it back in. You see he has a master board in front of him which controls the numbers that are called. * * *

Q. How would he get the ball back from the blower? A. Any one particular ball he would have to put, if he had it in his hands, he would have to put it back in the gutter and fix the gutter so the balls would dump back in.

Q. All three of them? A. Yes.

Q. Is that something that is readily observable by people in the hall? A. Yes, I would say so.

Q. How many times did you see him do this? A. I actually saw him do this particular thing twice.

Q. And the other fingering of the ball you saw about five times. A. Well, this is in conjunction with the fingering of the ball. Actually he fingered the ball the first time, he fingered three balls before—in other words, he would finger one ball and then dump it back and wait, when it came out again he would finger it and dump it back, finger it and dump it back and then finger it and then take it and have the fellow call it."

The Lodge member, whose duty it was to draw the balls from the chute and give them to the announcer during the progress of the game, was interrogated by the Commission as follows:

"Q. Before you picked up the ball would you handle it in any way? A. Well, the only thing I can answer there is if I did, I did it unconsciously. I have been doing it for a number of years and I always take the ball and that was it.

Q. Would you on occasion put the balls back before calling the numbers after they came out? A. When we had requests from the audience to shuffle them up and shake them up, one thing or another, we would throw them back there and give them another chance to go around again because at times balls would come out from time to time, and that's what we tried to prevent.

Q. So that balls would come out, then you say when there are requests from the audience you would put them back in and let three more balls come out? A. Yes, I would shuffle the opening there back again."

The Commission takes the position that its "determinations" in the instant case cannot be successfully challenged because, it asserts, the proofs furnish ample support therefor; that its adjudication that the Lodge violated the aforesaid statute was neither arbitrary nor did it constitute an abuse of discretion. For the same reasons it attributes finality to its decision as to the punishment it administered, which action it claims is likewise invulnerable to successful attack.

We find it necessary, as we have on prior occasions, to express the importance of our function in considering the propriety of the action of an administrative agency. We note initially the recognized rule that on a review of facts determined by such an agency, "a judicial tribunal is confined to the question of whether the findings are supported by substantial evidence, *i. e.*, such evidence as a reasonable mind might accept as adequate to support the conclusion * * * or, to express it differently, whether the evidence furnished a reasonable basis for the agency's action. * * * We do not interfere with the finding if it is supported by adequate evidence." *Zachariae v. New Jersey Real Estate*

*Commission*, 53 *N. J. Super*. 60, 62 (*App. Div*. 1958). Stated in another way: "The now generally accepted gauge of administrative factual finality is whether the factual findings are supported by substantial evidence." *Hornauer v. Division of Alcoholic Beverage Control*, 40 *N. J. Super*. 501, 504 (*App. Div*. 1956). See also *Marro v. Civil Service Dept.*, 57 *N. J. Super*. 335, 346 (*App. Div*. 1959); *Borough of East Paterson v. Civil Service Dept. of N. J.*, 47 *N. J. Super*. 55, 65 (*App. Div*. 1957).

In a concurring opinion by Judge Brennan in *In re Larsen*, 17 *N. J. Super*. 564 (*App. Div*. 1952), in which the majority opinion for this court had recognized, at *p*. 573, that the "duration of the suspension of the privileges of a liquor license rests within the sound discretion of the Director \* \* \*" we find the following (17 *N. J. Super*., at *pp*. 576–577):

"\* \* \* The now generally accepted gauge of administrative factual finality is whether the finding is supported by substantial evidence. \* \* \* It [the test] is the product of judicial thinking that the courts have a duty to supervise administrative justice 'in a political scheme grounded upon the wisdom of checks and balances to prevent usurpation and arbitrary exercise of power by any one of the three branches of government,' \* \* \* *Stason*, 89 *Univ. of Penn. Law Rev*. 1026, 1029 (June, 1941); \* \* \*."

■ Implicit in our right of review is the basic affirmative principle, not to be minimized, belittled or decried, that if the act of the administrative agency is found to be so "clearly against the logic and effect" of the facts as to demonstrate that it is "unreasonable, arbitrary or capricious," our duty is to reverse that action. *Lubliner v. Bd. of Alcoholic Bev. Con., Paterson*, 59 *N. J. Super*. 419, 431–432 (*App. Div*. 1960), modified, 33 *N. J.* 428 (1960).

Appellant points to the fact that, in essence, the Commission's determination of the Lodge's guilt in not "calling balls as they were drawn from the receptacle" rested merely on the fact that occasionally "the caller lifted the chute sending the balls back into the blower." Such an act, says

appellant, was not forbidden by any rule or regulation. Moreover, says appellant, it was a "common practice at bingo games." Appellant contends that "if the Commission is to forbid this practice, it must promulgate a rule or regulation before imposing a sanction."

While we recognize the Commission's "special expertness" in this particular field, we need not defer to that expertness to the same degree as might otherwise be required if the "issues are such that we can evaluate them as well as" the Commission. *Borough of Fanwood v. Rocco*, 59 *N. J. Super.* 306, 319 (*App. Div.* 1960), affirmed 33 *N. J.* 404 (1960). Such is the situation in the case at bar.

We believe that as to the first charge aforesaid, despite the absence of a specific regulation prohibiting the return of the balls to the receptacle (a point stressed by appellant), there was a violation of the statute in the conduct of the game. As to the penalty to be exacted, however, it is essential that consideration be given to several factors of such importance and significance as to render them controlling. *First:* We are here dealing with the activity of a long-established fraternal organization, duly licensed for the conduct of a game for charitable purposes. *Second:* As above observed, no cheating, deception or imposture in the conduct of the game is asserted. No fraudulent motive is alleged. In fact the criticized practice, occasionally employed, had, as noted, become a recognized procedure on audience demand. *Third:* The men who were in charge of the game were members of the Lodge, some of whom had been assisting in that particular activity for years. There is no suggestion that they were not responsible citizens, engaged in a laudable charitable endeavor. Included among them were an 81-year-old member of the organization and a man who held a responsible position as a traffic manager in an engineering concern.

As to the second charge, the proofs do not demonstrate such conduct on the part of the Lodge members as to justify the Commission's adjudication that appellant was guilty of

interference with its investigator in the performance of his assigned duties or that members of the Lodge threatened him with bodily harm. There is no doubt that the aforesaid argument was intense and bitter, but we are satisfied from the evidence that the investigator's own conduct accounted for much of the acrimony.

The action of the Commission, adjudging appellant guilty of violating *N. J. S. A.* 5:8–25, is affirmed. Its finding that appellant, under the proofs, was guilty of interfering with its investigator in the performance of his duties under *N. J. S. A.* 5:8–6 and threatening him with bodily harm is reversed.

 Nothing in this record can justify the severe penalties here exacted. The aforesaid penalties are vacated and a suspension of appellant's bingo license, only, for a period of 30 days is imposed.