78 N.J. Super. 128 (1963)
187 A.2d 731
COOLEY'S ANEMIA BLOOD AND RESEARCH FOUNDATION FOR CHILDREN, INC., APPELLANT,
v.
LEGALIZED GAMES OF CHANCE CONTROL COMMISSION, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 17, 1962.
Decided January 28, 1963.
*130 Before Judges GOLDMANN, FREUND and FOLEY.
*131 Mr. Nicholas Martini argued the cause for appellant.
Mr. Thomas F. Tansey, Deputy Attorney General, argued the cause for respondent (Mr. Arthur J. Sills, Attorney General, attorney).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Cooley's Anemia Blood and Research Foundation for Children, Inc. (Foundation) appeals from a finding, determination and order of the Legalized Games of Chance Control Commission (Commission), dated February 6, 1962, suspending all outstanding bingo licenses issued to the Foundation for a period of 18 months and declaring it ineligible to apply for such a license for a like period. The order was stayed pending determination of the appeal. The Foundation also filed a supplemental notice of appeal from a subsequent Commission determination denying it permission to pay out of the net proceeds of its bingo games any part of the counsel fees and expenses incurred in connection with the appeal.
The Foundation had duly qualified as a charitable organization for a license to operate weekly bingo games at Passaic Auditorium, Passaic, N.J., for the period October 25, 1960 through February 28, 1961. Its later application to amend the bingo license was approved and resulted in additional weekly games for the period March 7 through June 27 and from September 5 through October 24, 1961.
On August 15, 1961 the Commission notified the Foundation that it would be required to show cause on September 26, 1961 why any outstanding licenses issued to it should not be revoked for a period up to 30 months. The ground for the proposed revocation was that the Foundation had filed false reports of bingo games played at the Passaic Auditorium on January 3, 10, 17, 24 and 31, and on February 7, 14, 21 and 28, 1961, in violation of N.J.S.A. 5:8-25 and 5:8-37 and of Rules 3, 5 and 12 of Part VI, and also Part IX of the rules and regulations of the Commission governing the conduct of bingo games.
*132 N.J.S.A. 5:8-25 provides, in part, that charitable organizations may be licensed to conduct bingo games "under such conditions and regulations for the supervision and conduct thereof as shall be prescribed by rules and regulations duly adopted from time to time" by the Commission, but only "when the entire net proceeds of such games of chance are to be devoted to educational, charitable, patriotic, religious or public-spirited uses."
N.J.S.A. 5:8-37 requires an organization conducting bingo games to file a duly verified statement with the municipal clerk within 15 days after the holding of any game. The report is to show the amount of the gross receipts derived from each game, including receipts from the sale of shares, tickets or rights in any manner connected with participation in said game or the right to participate therein. Further, the report must show each item of expense incurred or paid, and the name and address of each person to whom each such item has been or will be paid, with a detailed description of the merchandise purchased or the services rendered. In addition, the report must include the net profit derived from each game, the uses to which the net profit has been or is to be applied, and a list of the prizes offered and given, with their respective values. The organization is required to maintain such books and records as may be necessary to substantiate the particulars of each report.
Turning to the Commission rules and regulations alleged to have been violated by the Foundation, Rule 3 of Part VI provides:
"The entire net proceeds of the games of chance must be devoted to authorized purposes. (See R.S. 5:8-25 as to Bingo and R.S. 5:8-51 as to Raffles.)"
Rule 5 of Part VI provides:
"No commission, salary, compensation, reward or recompense may be paid to any person for holding, operating or conducting, or assisting in the holding, operating or conducting of a game of chance, except for bookkeepers or accountants who assist by rendering their *133 professional services for an amount within the schedule of fees fixed by these rules. (See Schedule of Fees "B") (See R.S. 5:8-26 as to Bingo and R.S. 5:8-52 to Raffles.)"
Rule 12 of Part VI provides:
"No item of expense shall be incurred or paid in connection with the holding, operating or conducting of a game of chance, except such expenses as are bona fide items of reasonable amount for goods, wares and merchandise furnished or services rendered, which are reasonably necessary to be purchased or furnished for the holding, operating or conducting of the game of chance. (See R.S. 5:8-34 as to Bingo and R.S. 5:8-61 as to Raffles.)"
The pertinent sections of Part IX, which the Foundation was charged with violating, are Rules 1 and 5. Rule 1 requires that reports of operations be in the form and contain the information called for by Form 8B-A, prescribed by the Commission for bingo games. Rule 5 provides:
"If a licensee fails to file a report within the time required, or if a report is not properly verified, or not fully, accurately and truthfully completed, no further license shall issue to it, and any existing license shall be suspended until such time as the default has been corrected." (Italics ours.)
At the December 5, 1961 hearing, Norman D. Valentine, Executive Officer of the Commission, testified for the State. He said that a comparison of the reports filed by the Foundation with those of other organizations conducting bingo games in the area indicated that the Foundation's figures for the sale of extra bingo boards appeared to be lower than those of the other organizations. He had consequently assigned a team of investigators to audit the Foundation's games. The first audit was made March 7, 1961, and was followed by audits on March 14 and May 2 and 9, 1961. On each occasion the investigators counted the players, receipts from the sale of extra boards, and the total receipts from admissions, extra boards and specials.
Valentine testified that he had then analyzed the reports of operations filed by the Foundation for the weekly games *134 from January 3 to February 28, 1961 (this was the period preceding the March 7 audit and during which the organization was charged with having filed false reports), and from the March 7 audit up to and including May 30, 1961. Valentine determined for each game the number of players, the receipts from the sale of extra boards, the average receipts per player from those sales, the total receipts, and the average receipts per player of that total. These figures were tabulated and also charted.
Valentine was asked whether he noticed anything unusual in comparing the figures for the games played before the audit of March 7 and those subsequent to the audit. He testified that the per player average receipts from the sale of extra boards from January 3 to February 28 was $1.63, with a low of $1.53 and a high of $1.70. After the audit, and for the period March 7 to May 30, the average was $1.97, with a low of $1.82 and a high of $2.10. As for the total receipts, which includes admissions, extra board sales and sale of specials, the average per player before March 7 was $3.30, with a low of $3.21 and a high of $3.39. After that date the average was $3.63, with a low of $3.48 and a high of $3.72. The statistical analysis was introduced as Exhibit S-4 in evidence. This exhibit shows that the average per player from the sale of extra boards was substantially higher for each game from March 7 through May 30, as to both the minimum and maximum figures, and the average for the period was 34¢ higher than in the pre-audit period. The same is true with respect to the average total receipts per player: both the minimum and maximum average per game was higher in the post-audit period, and the overall average itself increased by 33¢.
The figures on Exhibit S-4 are not challenged, and this for the obvious reason that they were taken directly from the verified reports filed by the Foundation. A further examination of the figures on S-4 is revealing. For example, there were 356 players at each of the games played on January 24 and 31, 1961. They spent $590 on extra boards on January *135 24, and $586 on January 31. On March 14, 1961, subsequent to the audit, there were also 356 players present; however, they spent $748 for extra boards  a considerable increase. Again, on February 7, 1961 there were 420 players who paid $645 for extra boards. But on March 7 and May 30, 1961 there were only 404 players present, and yet they spent $823 and $822 for extra boards on those respective dates.
Valentine testified that the increase of some 30¢ in the average receipts from the sale of extra boards per player, and in the average of total receipts per player, remained constant after March 7. He also testified regarding an analysis of the figures reported by two other organizations conducting bingo games at the Palace Theatre, Passaic, a comparable premises. Council for the Foundation objected to the use of these figures, but Valentine was allowed to testify as to whether they showed a constant average per player spent for extra boards, or any sudden increase or decrease. His analysis covered the same periods as for the Foundation, i.e., January 3-February 28 (pre-audit) and March 7-May 30, 1961 (post-audit). He said that the average spent per player at the games conducted by the other two organizations remained at a fairly constant average. In the case of one organization, the average per player for both extra boards and total receipts was slightly higher in the pre-audit period; in the case of the other it was slightly lower. Valentine was also permitted to testify over objection that an analysis of reports submitted by other organizations in the North Jersey area showed that the per player average for extra boards remained fairly constant.
Valentine said that the figures submitted by the Foundation for the four audit dates closely approximated the audit figures arrived at by the Commission investigators. It was his opinion that the reports submitted prior to the first audit "did not accurately reflect the receipts, the total receipts from the sale of extra boards and, consequently, the total receipts *136 from the games for those dates, and that the reports after the audit did reflect the true figures."
On cross-examination, counsel for the Foundation attempted to show that weather conditions, physical facilities, and other factors would account for the variation in the reports submitted by the organization. Valentine agreed that the weather could affect both the gross and net proceeds of bingo games. The number of volunteers available to assist at the games could also have some effect; so could the place where the games were played, and the lack of heat in cold weather or air-conditioning in hot weather. On redirect examination he explained that these factors might affect the gross and net proceeds since they influence attendance; they would, however, have no significant effect upon the average spent per player for extra boards and the average total receipts per player per game. He specifically testified that such factors do not affect the constancy of the per player averages.
Testimony was received concerning the nature of the audit made on May 9, 1961, and it was stipulated that those on March 7 and 14, and on May 2, 1961, were conducted in the same manner. The State then rested. Counsel for the Foundation moved that the charges be dismissed for lack of proof, and the motion was denied.
Rose Catanzaro, the person who was in charge of the games from January 3 through February 28, 1961, and who was responsible for making the weekly reports, was the only witness for the Foundation. She said that the reports filed for those games accurately reflected the number of boards sold, the gross income and net proceeds, and that those proceeds had been used for authorized purposes. On direct examination she said that the Passaic Auditorium did not have parking facilities and that those attending had to climb steps to get to the bingo area. She mentioned that the heating equipment had broken down a few weeks before  the hearing took place December 5, 1961  and some people had left. She did not testify, however, as to unfavorable *137 weather conditions or lack of heating in the bingo hall on any of the January and February dates in question  matters which had been referred to in questions put to Valentine on cross-examination in order to elicit answers that these might affect gross and net income. It is appropriate to refer once more to Valentine's testimony that these factors, like some of the others mentioned by counsel for the Foundation, would not substantially affect the average per player for extra board sales and total receipts.
Mrs. Catanzaro was unable to give any explanation for the large variation in the average figures in the pre- and post-audit periods. For example, when asked whether she believed that weather would affect the amount an individual would spend in one week and what he might spend the next, she said she did not think so. She could give no reason for the large spread in average spending. One of the members of the Commission asked if she could explain the increase in the sale of extra boards from $660 on February 28, when there were 400 players, to $823 on March 7, the night of the first audit, when 404 players were in attendance. She could not. Nor could she give an explanation for the sale of 590 extra boards on January 24 as against 748 on March 14, although exactly 356 patrons were present on both nights.
The Foundation renewed its motion for dismissal at the close of all the testimony. The motion was denied.
The Foundation first argues that there is no proof whatsoever of any violation of N.J.S.A. 5:8-25 and 5:8-37, or of Rules 3, 5 and 12 of Part VI of the Commission's rules and regulations, referred to above. However, if there was substantial evidence to establish that the Foundation had reported less than the amount received from the sale of extra boards for the games played in the pre-audit period, and less than the total receipts, then it must logically follow that part of the receipts were devoted to other than authorized purposes (see N.J.S.A. 5:8-25 and Rule 3 of Part VI, above), and went for services not permitted or reported (see N.J.S.A. 5:8-37 and Rules 5 and 12 of Part VI).
*138 Part IX of the Commission's rules and regulations, as we have noted, requires that the report of each bingo game be "fully, accurately and truthfully completed." The Foundation contends that the finding, determination and order of the Commission are not supported by substantial evidence. We hold to the contrary.
The Commission is a state administrative agency, authorized to suspend the bingo license of any organization, and to revoke it after hearing, for any violation of any provision of the Bingo Licensing Law, L. 1954, c. 6, as amended (N.J.S.A. 5:8-24 et seq.), or of the rules and regulations of the Commission. N.J.S.A. 5:8-30. Proceedings before the Commission are civil in nature. See Atkinson v. Parsekian, 37 N.J. 143, 155 (1962); In re Schneider, 12 N.J. Super. 449, 454 (App. Div. 1951); The Panda v. Driscoll, 135 N.J.L. 164, 165 (E. & A. 1947); Grant Lunch Corp. v. Driscoll, 129 N.J.L. 408, 410 (Sup. Ct. 1943), affirmed o.b. 130 N.J.L. 554 (E. & A. 1943).
In proceedings before an administrative agency it is only necessary to establish the truth of the charges by a preponderance of the believable evidence, and on appeal the factual determinations of the agency will generally be sustained if they are supported by substantial evidence on the whole record. Atkinson v. Parsekian, above, at page 149, and cases cited; Elizabeth Lodge No. 289, etc. v. Legalized Games of Chance Control Commission, 67 N.J. Super. 239, 245 (App. Div. 1961). "Substantial evidence" has been defined as "such evidence as a reasonable mind might accept as adequate to support the conclusion * * * or, to express it differently, whether the evidence furnished a reasonable basis for the agency's action." Zachariae v. N.J. Real Estate Comm'n, 53 N.J. Super. 60, 62 (App. Div. 1958). And see United Hunters Ass'n of N.J., Inc. v. Adams, 36 N.J. 288, 292 (1962), where the court said that if a subject is debatable, the agency determination must be upheld; otherwise the court would be performing the administrative function itself, and upon that approach become the legislative body. *139 Further, that the judiciary can interfere with an agency determination only when it is plainly demonstrated to be arbitrary.
We conclude that the Commission, upon the facts presented before it, could legitimately infer that the reports submitted by the Foundation for the weekly games held in January and February 1961 before the first audit, were false. It has been said that
"The heart of the fact-finding process often is a drawing of inferences from the evidence. A fact finder may draw inferences from the words or gestures or inflections or demeanor of a particular witness, may infer a particular basic fact from the testimony of one or more witnesses on one side or on both sides, and may infer an ultimate fact from undisputed basic facts or from an entire record of conflicting evidence. In 1927 in reviewing an FTC order, a unanimous Supreme Court enunciated a basic proposition of law: `The weight to be given to the facts and circumstances admitted, as well as the inferences reasonably to be drawn from them, is for the commission.'" 4 Davis, Administrative Law, § 29.05, pp. 137-138 (1958).
and
"The question for the reviewing court is thus whether the conclusions `reasonably may be based upon the facts proven.' The court may not substitute its judgment on the question of whether the inference drawn is the right one or whether a different inference would be better supported. The test is reasonableness, not rightness." (Ibid., at page 139.)
The drawing of inferences based upon facts represents a practical exercise in reasoning, both in life and in the law. The ordinary reasonable man engages in inductive reasoning almost every day of his life. Courts do, too  in a wide variety of situations, including the most serious criminal proceedings where the State's burden of proof must be beyond a reasonable doubt. In criminal tax evasion cases based upon net worth, when the Government has presented its ordinary proof and the taxpayer fails to come forward with an adequate explanation, the fact-finding body can reach a finding of guilt on the inference that the net worth increases are *140 attributable to currently taxable income, and not to other forms of asset acquisition, such as gifts and inheritances. Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954), rehearing denied 348 U.S. 932, 75 S.Ct. 334, 99 L.Ed. 731 (1954); and see Schmidt, "Hybrid Methods of Reconstructing Income in Criminal Tax Fraud Cases," 47 A.B.A.J. 560 (1961). So also in cases dealing with violations of section 8(a)(3) of the Taft-Hartley Act, the National Labor Relations Board may, in making its factual determination, reasonably infer from the nature of the discrimination a tendency to encourage or discourage union membership. Radio Officers' Union, C.T.U. v. N.L.R.B., 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954).
We recognize the Commission's expertise in the field of legalized games of chance. See Freud v. Davis, 64 N.J. Super. 242, 246 (1960), where we adopted the language in Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951), that an administrative agency is "presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect." Courts generally defer to the special expertness and broad experience of an administrative agency in its general field, but not in the same degree in all cases. It depends upon the issues, and where they are such that we can evaluate them as well as the agency, we do not defer to its expertise to the same degree. See Fanwood v. Rocco, 59 N.J. Super. 306, 319 (App. Div. 1960), affirmed 33 N.J. 404 (1960); Elizabeth Lodge No. 289, etc. v. Legalized Games, etc., above, 67 N.J. Super., at page 247.
The question in every case is whether a reasonable man, acting reasonably, could have reached the administrative agency decision under review, from the evidence found in the entire record, including the inferences to be drawn therefrom. Freud v. Davis, above, at page 246; and see Stason, "`Substantial Evidence' in Administrative Law," *141 89 U. of Pa. L. Rev. 1026, 1038 (1941); Stern, "Review of Findings of Administrators, Judges and Juries: A Comparative Analysis," 58 Harv. L. Rev. 70, 89 (1944). The answer to that question must be in the affirmative, after giving due deference to the Commission's expertise, and in the light of our own review of the entire record. We find that its action was reasonable and legally grounded. Atkinson v. Parsekian, above, at page 149; Fanwood v. Rocco, above, 33 N.J., at pages 414-415.
The Foundation also contends that there can be no presumption of the existence of the violations alleged to have occurred in connection with the January and February 1961 games, by reference to the respective audit figures, because the conditions existing when the games were held were not the same or comparable. In the first place, the comparison was between the games played in January and February 1961 before the first audit of March 7, and those played in the three months following. But more important, there need be no resort to any presumption to support the clear inference that the Foundation's reports for the weekly games in January and February were false, because the reports it filed after the first audit revealed a substantial and unexplained increase in the per player average for the sale of extra boards and for total receipts.
During the hearing, counsel for the Foundation persistently directed his questions to the gross and net receipts of the organization. It was clearly established that these latter figures, unless analyzed, were not relevant to contradict the averages established by Valentine. The gross and net figures might exhibit a considerable fluctuation, as Valentine pointed out, but the averages per player for the sale of extra boards and with regard to total receipts would remain relatively constant. In this connection we note that the evidence that the averages remained constant was uncontradicted.
The Foundation claims that the action of the Commission in denying it permission to use the proceeds of its bingo games to pay fees and expenses in connection with this appeal *142 was beyond the Commission's jurisdiction and unconstitutional. The burden is upon the Foundation to show that the ruling is not authorized by statute or is unreasonable. Daughters of Miriam Home, etc. v. Legalized Games of Chance Control Commission, 42 N.J. Super. 405, 409, 415 (App. Div. 1956). It failed to discharge that burden.
The 1947 Constitution, Art. IV, Sec. VII, par. 2, as amended on November 3, 1953, permits the conduct of bingo games and raffles by bona fide charitable and certain other organizations, but only "when the entire net proceeds of such games of chance are to be devoted to educational, charitable, patriotic, religious or public-spirited uses." The Bingo Licensing Law, L. 1954, c. 6 (N.J.S.A. 5:8-24 et seq.), giving effect to the constitutional provision, permits the licensing of bingo games where the entire net proceeds are to be devoted to one of the prescribed uses. N.J.S.A. 5:8-25. Neither the Constitution nor the statute permits an organization to use bingo game proceeds for purposes other than those specified.
Furthermore, N.J.S.A. 5:8-34 prohibits the payment of compensation, either directly or indirectly, "to any person holding, operating or conducting, or assisting in the holding, operation or conduct of, any game of chance * * * except that reasonable compensation may be paid to bookkeepers or accountants for bookkeeping or accounting services rendered according to a schedule of compensation prescribed by rule of the Legalized Games of Chance Control Commission." There is no reference to attorneys' fees or costs of litigation anywhere in the statute. The right to pay such fees and costs may not be implied where the Legislature has specifically designated the only persons who may be paid and the only services which may be paid for.
The Foundation argues that the Commission ruling violates the Fifth and Sixth Amendments of the Federal Constitution, and Art. I, par. 10 of our 1947 Constitution. These deal only with criminal proceedings. As we have pointed out, what is involved here is a civil proceeding.
*143 The argument is also made that the Commission ruling violates the Fourteenth Amendment of the Federal Constitution in that it makes virtually impossible an appeal from any adverse ruling. The ruling did not deprive the Foundation of either its right to appeal or its right to counsel. Costs and counsel fees on appeal may be paid from other funds presently available to the organization or secured by means other than the conducting of bingo games.
Affirmed.