SENIOR CITIZENS AND PUBLIC SERVICE EMPLOYEES OF ILLINOIS, Plaintiff-Appellant, *v.* THE DEPARTMENT OF REVENUE *et al.*, Defendants-Appellees.

First District (2nd Division) No. 79-754

Opinion filed June 17, 1980.

John J. Muldoon, of Chicago, for appellant.

William J. Scott, Attorney General, of Chicago (Robert G. Epsteen, Assistant Attorney General, of counsel), for appellees.

Mr. JUSTICE DOWNING delivered the opinion of the court:

Defendant, the Department of Revenue, revoked a license for the conducting of bingo[1] which it had issued to plaintiff, Senior Citizens and Public Service Employees of Illinois, a fraternal organization. Defendant found that plaintiff had violated section 2(4) of the Bingo License and Tax Act (Ill. Rev. Stat. 1977, ch. 120, par. 1102(4)), which limits the aggregate retail value of all prizes or merchandise awarded in any single day of bingo to $2,250. Plaintiff then filed this action for administrative review (Ill. Rev. Stat. 1977, ch. 110, par. 264 *et seq.*), but the circuit court confirmed defendant's action. Plaintiff appeals, contending that (1) because the administrative record was so ambiguous and unclear, a true determination of the facts was impossible, and (2) the revocation of the bingo license for six months was too severe a penalty for the alleged violation.[2]

At the administrative hearing on August 14, 1978, defendant introduced a notice of hearing informing plaintiff that a hearing had been

---

[1] 3 Encyclopaedia Britannica 624 (1968) describes bingo as follows: "To play bingo, which is a form of lottery (q.v.), each player purchases one or more cards divided into numbered and blank squares. Random numbers, usually up to 75 or 90, are called out in England often in a vocabulary peculiar to the game—for example, 'legs eleven' for 11; 'two fat ladies' for 88. The first player to achieve a card (or a line) with all of his numbers, usually 20, shouts 'bingo!' and collects the entire stake money, usually less a specified percentage, if that is permitted by local law."

[2] The circuit court granted a stay of the administrative determination while the proceedings were pending in the trial court. After the appeal was docketed in this court, we also granted a stay.

scheduled to hear evidence concerning alleged violations of the Bingo License and Tax Act for the purpose of determining whether the license issued to plaintiff should be revoked. The notice specified that plaintiff was charged with violating section 2(4) of the Act in that "* * * the aggregate retail value of all prizes or merchandise awarded in a single day of bingo exceeded $2,250." Ill. Rev. Stat. 1977, ch. 120, par. 1102(4).

Donald Burton, a special agent and investigator for defendant, testified that pursuant to an assignment from his supervisor to conduct an investigation of plaintiff, he went to 6800 North Western Avenue, on November 19, 1977, about 5:30 p.m. There he purchased bingo cards, observed, and participated in the games which started at 7:15 p.m. During the games he made notes concerning each type of game, the amount of cash in the game, and the amounts of the prizes; that according to his notes and testimony the total amount of cash and merchandise awarded came to $5,053. For example, $70 in total was paid on the first game: $10 was the "golden egg" payment; $39 was for three winners on the master card; and $21 was paid for the three winners on the regular cards. Burton further testified to the various types of games he observed during the evening prior to his departure at 10:30 p.m.

John Fearon testified that he is president and administrator of plaintiff, which conducts the bingo games at 6800 North Western Avenue in Chicago. He also testified concerning the operation of the hall and the bingo games. He admitted receiving a letter addressed to the "flea market" at 6800 North Western Avenue dated November 18, 1976. This letter was presumably from defendant, and it advised about the maximum value of bingo prizes. He said that the letter was inapplicable to plaintiff because "we did not give $3,000 away in 76."

Under examination by his own counsel, Fearon testified that the letter dated November 18, 1976, was not directed to anyone in particular, and that 11 organizations operated bingo games at the "flea market."

The hearing officer found that plaintiff had violated the Bingo License and Tax Act by awarding $5,053 in total aggregate prizes on November 19, 1977, and he recommended that plaintiff's license be revoked for a period of six months. The hearing officer noted that it was not denied that an aggregate of $5,053 in prizes was awarded, but it was only asserted that the source of the excess prizes was from rental receipts and not the sale of bingo cards. The hearing officer found that, although John Fearon had testified there was "confusion" in interpreting the applicable statute as it pertained to money prizes, that statute was clear, and the fact that Fearon admitted receiving the November 18, 1976, letter restating the legal limitation of prizes established in the statute "minimized" plaintiff's contention that there was "confusion" as to money prizes, especially since the letter warned that failure to comply might result in loss of the bingo license.

## I.

■■ Plaintiff's first contention is that defendant's decision is against the manifest weight of the evidence and unsupported by substantial competent evidence. Neither the circuit court nor this court should disturb an administrative decision "* * * so long as it is supported by substantial evidence, and is neither arbitrary nor contrary to the manifest weight of the evidence." *Daley v. Jack's Tivoli Liquor Lounge, Inc.* (1969), 118 Ill. App. 2d 264, 277, 254 N.E.2d 814.

We find that the administrative decision is supported by substantial evidence and was not contrary to the manifest weight of the evidence presented at the hearing. We have here uncontradicted testimony by defendant's special agent that on the evening he continuously attended the bingo games the prizes awarded totaled $5,053, all of which were awarded at bingo in cash except for the turkeys, which he valued at $100. We cannot say that the administrative finding was erroneous, particularly where plaintiff did not deny that $5,053 in prizes was actually awarded. We cannot agree with plaintiff's claim that the notes made by the agent are ambiguous. We have examined the agent's testimony and find it to be consistent, clear, and convincing. Having considered all the evidence, we conclude that defendant did not err in finding that plaintiff violated the bingo statute by awarding prizes worth more than the $2,250 maximum set forth in the Act. Ill. Rev. Stat. 1977, ch. 120, par. 1102(4).

## II.

■■ In a related argument, plaintiff contends that certain of the prizes, although awarded at the location of the bingo game, were not bingo prizes. Plaintiff points to so-called "golden egg" prizes which were awarded in conjunction with each of the bingo games and varied from $10 to $100, the raffle of the seven turkeys (and the $350 in $50 bills attached to the turkeys), and the raffle of the seven $100 bills. Plaintiff says that these prizes had nothing to do with the game of bingo or with the participants of the bingo game, and that the source of the prize money for these prizes was not the sale of bingo cards. Defendant responds that if the "golden egg" and raffle prizes, which were awarded during the course of the bingo games, were to be excluded from the limitations imposed by the statute, they would constitute illegal lotteries in violation of the gambling provisions of the Criminal Code of 1961. (Ill. Rev. Stat. 1977, ch. 38, pars. 28—1, 28—1.1, 28—3.) We agree with defendant's interpretation of the statute and with its determination that the "golden egg" and other raffle prizes are bingo prizes because they were awarded during the course of the bingo game.

The testimony of the agent is clear that all the prizes were closely connected. All the prizes awarded, including the turkeys, could properly be considered "prizes" and "merchandise" which were "awarded in any

single day of bingo." Consequently, the retail value of all these prizes was properly considered in determining whether the aggregate "retail value" of "all prizes or merchandise awarded" on that day exceeded $2,250. It is quite clear from Agent Burton's testimony and from the contemporaneous notes which he made that the "golden egg" drawings were intimately related to the bingo card winners.

While the court may not set aside findings of fact made by the agency unless they are against the manifest weight of the evidence, the court is not bound by the agency's conclusions of law. (*Caterpillar Tractor Co. v. Department of Revenue* (1963), 29 Ill. 2d 564, 194 N.E.2d 257.) Under the circumstances here, we conclude that defendant correctly interpreted the law in finding that all of the prizes, whether awarded in cash or merchandise, constituted prizes or merchandise awarded in a single day of bingo, regardless of the source of the proceeds. As defendant points out in its brief, the limitations which the statute places upon the operation of bingo, such as the limitation on the amount of prizes awarded, are designed to keep bingo games from becoming large-scale operations. Plaintiff's claim that the source of the prizes was rentals paid by the other organizations using the hall on other occasions, therefore apart from whether these drawings were an illegal lottery (a question we do not and need not decide), is irrelevant in determining whether there has been a violation of section 2(4) of the bingo statute. We hold that such prizes are bingo prizes if they are awarded during bingo, and are closely connected with bingo as happened here, regardless of the source of the prize money.

### III.

■■ Finally, plaintiff contends it was an abuse of discretion for defendant to have revoked its license for a period of six months. No authority is cited in support of this argument. However, this contention is partly premised on the foregoing argument, which we have rejected, that awarding the "golden egg" and other awards came from events other than bingo, and, consequently, that there was not a "substantial" violation of section 2(4). We agree with defendant that whether the six-month revocation was an appropriate penalty depends upon whether it was within the sound discretion conferred upon it by statute; if so, then the sanction should not be disturbed by this court. *Kessel v. Illinois Liquor Control Com.* (1978), 56 Ill. App. 3d 485, 491, 371 N.E.2d 1210.

■■ In assessing the penalty imposed, we consider it to be significant that the plaintiff had previously been warned about such a violation. In addition, the prizes awarded here, $5,053, more than double the maximum limit allowed by statute. The revocation of a license for a period of six months is a penalty well within the contemplation of the statute, which specifically authorizes revocation (Ill. Rev. Stat. 1977, ch.

120, par. 1104), and is well within "the State's plenary police power to regulate gaming activity." (*Finish Line Express, Inc. v. City of Chicago* (1978), 72 Ill. 2d 131, 140, 379 N.E.2d 290.) As previously noted, section 2(4) of the bingo statute is a part of the State's regulatory plan for limited gambling, intended to prevent bingo games from becoming large-scale profit-making operations. We consider that plaintiff's conduct was a serious violation of the statute and cannot find any circumstances in the record mitigating against the sanction imposed by defendant. (*Cf. Scranton Volunteer Fire Co. v. Ball* (1971), 323 N.Y.S.2d 463, 37 App. Div. 2d 757, *aff'd* (1972), 330 N.Y.S.2d 802, 30 N.Y.2d 589, 281 N.E.2d 848; *Elizabeth Lodge No. 289, B.P.O.E. v. Legalized Games of Chance Control Com.* (1961), 67 N.J. Super. 239, 170 A.2d 471.) We conclude that the sanction of a six-month revocation of the bingo license was not an abuse of discretion.

For the reasons given, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

PERLIN, P. J., and HARTMAN, J., concur.