72 N.J. Super. 125 (1962)
178 A.2d 74
NICOLA CELESTE, BY CATHERINE CELESTE, HIS WIDOW, PETITIONER-RESPONDENT,
v.
PROGRESSIVE SILK FINISHING COMPANY, RESPONDENT-APPELLANT.
CATHERINE CELESTE, PETITIONER-RESPONDENT,
v.
PROGRESSIVE SILK FINISHING COMPANY, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 13, 1961.
Decided February 1, 1962.
*126 Before Judges CONFORD, FREUND and LABRECQUE.
*127 Mr. Isidor Kalisch argued the cause for appellant.
Mr. Aaron Gordon argued the cause for respondent (Messrs. Schwartz & Horowitz, attorneys; Mr. Gordon, of counsel).
The opinion of the court was delivered by FREUND, J.A.D.
This is an appeal from a judgment of the Hudson County Court which affirmed an award of compensation by the Division of Workmen's Compensation to the petitioner, Catherine Celeste, for the injury and subsequent death of her husband, Nicola, arising out of and in the course of his employment.
On this appeal we have made our own independent study and analysis of the record "to determine the facts and evaluate them." Russo v. United States Trucking Corp., 26 N.J. 430, 435 (1958). The sole ground of appeal is that petitioner failed to sustain the burden of proving that decedent suffered an accident which contributed to and hastened his death from cancer.
Petitioner's evidence was composed of exhibits, her own testimony and that of her son Nicholas Celeste, Jr., Louis Mastrofino, and Doctors Charles J. Modero, Dominick A. Mauriello, Leo Horowitz and Saul Lieb.
On September 7, 1955 Nicola Celeste, 47 years of age, was employed as operator and beamer by respondent Progressive Silk Finishing Co. (Progressive) of Hoboken, N.J. At 10 o'clock that morning he and Mastrofino, a co-worker, each lifted one end of a roll of bengaline dress material in order to place the roll on a machine. As they were setting it into place, Celeste suddenly said, "My back hurts, Lou." Mastrofino urged him to drop the roll which he did. Within a matter of minutes Mastrofino and Celeste reported the injury to Andrew Clemente, a plant superintendent. Mastrofino described the material as 41 inches wide and rolled on a 52-inch-wide shell; a bar or pipe extended through the roll and was used to lift the goods. He estimated *128 the total weight as between 450 and 550 pounds. Immediately after the episode he observed Celeste walking in a slouched position and was of the belief that he continued working for the rest of the day.
Since Celeste was deceased, his detailed written statement, made on November 17, 1955, concerning the events under review, was received in evidence at the hearing. It is as follows:
"I have worked for Progressive Silk Finishing Company since 1942 or 1943. My job there is as Beamer. I earn $1.59 an hour, 40 hours a week.
On Thursday, September 1, 1955 I was doing my regular work. I went over to help Louis Mastrofino lift a roll of goods. It weighed 300-350 pounds, the roll of cloth did. When I lifted, I felt a little pinch in my back on the left side right at the belt line. Nothing hit me and I didn't fall. I told Louis about it. I continued working. The next week I spoke to Andrew Clemente, the foreman, and told him that my back was bothering me. I went to the office and the lady on the telephone told me the company Doctor was Doctor Modero * * *.
I went to see him and continued working for about 3 weeks. Dr. Modero gave me some tablets; * * *. I continued seeing him for about seven weeks. My back kept getting worse and finally I had to stop work. I haven't worked since the end of September, 1955.
About three weeks ago, Dr. Modero said he couldn't do anything else for me, but that he could order a belt.

* * * * * * * *
I went to the company and Mr. Schneider sent me to Dr. Ruoff, Union City. He examined me * * *. My back still hurt so I finally went to a Dr. Patalino, * * * he wouldn't handle my case, * * *. Dr. Patalino gave me the name of another Doctor who had me admitted me [sic] to the Jersey City Medical Center, * * *. The Company did not send me to either of these Doctors.
The Doctor who is treating me now is giving DEEP treatments. He also is conducting tests. Doctor Paladino [sic] is the one who prescribed a belt. * * *.
"Now I have pain in the left side of my back and in both legs.

* * * * * * * *."
The decedent's wife testified that previous to this incident her husband was in good health, except for an occasional cold, and never had a doctor. On the day he was injured, however, he returned home at about 5:20 P.M. (his hours at Progressive were 8:00 A.M. to 5:00 P.M.), *129 complained that his back bothered him and went directly to bed. Despite a rubdown administered by his wife, the pain made it impossible for him to lie still in bed. Mrs. Celeste said from that day until the day he died her husband suffered from the back pain. While at home he was "always on the go" and was unable, because of the pain, to sit, stand or lie down for any period of time.
On September 8, 1955, pursuant to directions by Progressive, Celeste went to Dr. Modero for examination and treatment. The history received by Dr. Modero included the lifting episode and the sharp pain in the muscles of the lower part of his back. Based on his clinical findings, Dr. Modero diagnosed that the patient had suffered a strain of the muscles of the lower part of his back (the lumbosacral area). X-rays of the pelvis and lumbosacral spine, taken on September 27, 1955 at Dr. Modero's request at St. Mary's Hospital, were "essentially negative," according to the roentgenologist's report. Dr. Modero administered drugs to relieve the pain and to minimize the muscle spasm. The pain, as time went on, did not subside.
Celeste continued to be employed by Progressive throughout September 1955. His son, Nicholas, Jr., age 27, testified that on the night of the accident or soon thereafter he went to the home of his parents in response to his mother's telephone call. He found his father in "very great pain." "[H]e would lie down maybe 15 minutes and likewise he would get up maybe another 15 minutes and walk around. Then he would sit down in a chair. He could never stay in any given position for any too long of a time." Thereafter, Nicholas went to his parent's home every night after business and almost all day on Saturday and Sunday. He corroborated his mother's testimony as to his father's pain, his inability to remain still and general worsening physical condition during the remainder of his life.
On September 30, 1955, approximately one month after the injury, Celeste left his job at Progressive and never returned.
*130 On October 28, 1955, after 11 treatments to relieve the pain and relax the muscle spasm, Dr. Modero concluded that the pain complained of was increasing in intensity and "was somewhat disproportionate to the amount of muscle strain that he sustained as a result of the injury." He advised that a complete medical examination be made by his family doctor, and he did not see him thereafter.
On November 8, 1955 Celeste was first admitted to the Jersey City Medical Center under the direction of Dr. Valergakis, a neurologist. By then, according to his son's testimony, his father had definitely lost weight, his eyes were drawn and surrounded by black shadows. His son had to help him up the hospital steps. Celeste's medical history was taken at the hospital and later read into the record. It denied "all signs or symptoms of disease until September 1, 1955, when he developed a pain in the left low back after lifting a roller at work. The pain radiated down the lateral and anterior aspect of both thighs." Since that date "the pain has been persistent and dull with occasional or periodic spells of complete disappearance of the pain. Shortly after, the pain began to radiate down to both legs, particularly the back of the legs, and especially down the right leg. He has experienced no aggravation of the pain on coughing. He was unable to sleep at night without the analgesics or narcotics. Of equal interest is an unqualified loss of appetite and of about ten pounds over this period of time." The patient was described as "comfortable but anxious." The remainder of the history offered no medical explanation for the pain.
On November 23, 1955, at Dr. Valergakis' request, Dr. Mauriello, a specialist in internal medicine, undertook to care for the patient. He found localized point tenderness in the left of the lower back and in the midline, radiating downwards. There was no pain at that time in any other part of the body. A blood test taken on November 18, 1955 disclosed the "tremendously important" presence of alkaline phosphatase, an indication of activity in the bones *131 due to an organic process. This finding, plus the unusual progression and persistence of symptoms, generally represented bone destruction. Although he was "very, very sure" that the patient had "malignancy metastatic to bone," he was uncertain of its origin or prime cancer locale. He had himself treated many hundreds of cases of metastatic lesion (a lesion is a wound or a local degeneration). A metastatic condition is an offspring of cancer and consists of the transfer of a disease or diseased matter from one part of the body to another not connected with it. Dr. Mauriello admitted that decedent's 1955 X-rays did not reveal any metastatic lesion in the bones. Nevertheless, he was convinced Celeste was suffering from more than an ordinary back strain. Further blood tests were made on November 22 and December 15, 1955. They revealed an increased presence of alkaline phosphatase indicating the progression of disease.
Dr. Mauriello further testified that the usual origins or locales of primary cancer in the male are in the thyroid, lung, prostate and kidney. He observed that its locale does not make a difference in therapy but will occasionally determine whether the progression of the metastasis will be swift or slow.
During this first hospital admission, Dr. Leo Horowitz, a diagnostic and therapeutic radiologist, interpreted X-ray films of Celeste's chest and lumbar spine. The first pictures were taken on November 10, 1955. He was informed that Celeste's clinical diagnosis was "a typical ruptured disc." He testified that the X-rays of the lumbar spine and pelvis, AP and lateral planes, disclosed minimal hypertrophic spurs about the anterior margin of the body of L4 and, to a lesser extent, involving L3. There was no demonstrable destructive process of an inflammatory neoplastic nature. The possibility of a herniated nucleus pulposus, in light of Celeste's medical history, he said, could not be ruled out. The chest X-rays revealed considerable streaking in the left third anterior interspace extending to the hilum which appeared to be the residuum of an old healed inflammatory *132 disease. The streaking could have been the residuum of an old tuberculosis or possibly an unspecific respiratory process. There was no evidence of recent infection or recent activity or cavity; the remainder of the lung fields were clear. Questionable emphysematous changes were noted at the bases.
There were some studies made of the lumbosacral region on November 14, 1955. They also failed to demonstrate any evidence of a destructive process involving the bones included in this examination. Dr. Horowitz noted that minimal sclerotic changes were seen at the sacroiliac joints and the possibility of a herniated nucleus pulposus was not to be ruled out by his study. A third series of pictures, taken on December 5, 1955, revealed "some irregularity in the right sixth posterior rib," although it was not adequately deliniated on the films. The infiltrate in the left infrascapular region appeared to be smaller as compared to earlier study. The remainder of the lung field and bones included in the study appeared to be intact. In sum, the patient's 1955 X-ray films, aside from Dr. Horowitz's notation of "some irregularity in the right sixth posterior rib," did not disclose that he was suffering from cancer.
On December 21 Celeste was discharged from the Medical Center. His hospital record, signed that day by Dr. Mauriello, indicated "left sacroiliac strain, etiology undetermined, possibly metastatic malignancy." His son brought him home and observed that his father was in a worse condition than when he had been admitted. Celeste never left his apartment; he only walked in and out of the rooms, took hot baths and placed hot towels on his back. None of these measures seemed to ease the pain.
On January 4, 1956 Celeste returned to the Medical Center and was again placed under the care of Dr. Mauriello. He still complained of the back pain but also reported pain in his "knees (especially left knee), sometimes in the wrists and shoulders." His intervening history remained "essentially negative." The next day, a Dr. Karvouni examined him *133 and found there had been no essential change since the previous examination of December 5, 1955. He noted that "our impression remains the same that this could either represent an old inflammatory disease or could represent a developing bronchogenic carcinoma. * * * sacroiliac joints: flat film shows no essential change * * * [A]gain no bony abnormalities are noted."
Dr. Mauriello visited his patient on January 6, 1956. He noted on the hospital record that Celeste's alkaline phosphatase continued high and that he had a lesion in the left lung. He decided to reinvestigate and probably to recommend an exploratory operation for pancreatic cancer. On January 13, 1956 the alkaline phosphatase was still high and a persistent heart-shaped negative shadow had been located in the mid-descending colon. He further reported that "Metastatic malignancy is still the best bet."
On January 16, 1956, a Dr. Perkel re-examined the patient and found a faint negative shadow in the descending colon, similar to the one previously seen. He reported that "we believe this represents a small polyp" (a projecting mass of swollen and hypertrophoid mucous membrane) but "[T]here are no direct signs of carcinoma in the colon."
On January 18, 1956 another examination revealed a hard nodule in the area of the left forearm and right shoulder and over the left tenth rib. Thereupon Dr. Mauriello ordered that a biopsy be performed. By this time, in addition to his constant back pains, Celeste was also complaining of pain in his ribs, head, forearm, right shoulder and face. On January 24, 1956 the biopsy was performed by Dr. Harold C. Benjamin. He removed a small beam-shaped isolated nodule from the intercostal muscles over the left tenth rib and found the nodule to be completely surrounded by, and located within muscle tissue. The biopsy report indicated adenocarcinoma (a malignant tumor).
On the same day Dr. Horowitz examined more spot film X-rays but found no evidence sufficient to warrant radiological diagnosis of metastatic disease. He did find a questionable *134 sclerotic region in the innominate bone adjacent to the sacroiliac joint. Based on this examination and the fact that the patient was suffering from severe back pain, unexplained by any concrete diagnosis, either of a disc lesion or an arthritic change in the spine, he advised that acid and akaline phosphatate studies be made to rule out the possibility of a metastatic lesion. Some of these tests were later taken. He was aware that the essential symptoms of spinal metastasis may be severe pain which precedes the X-ray findings by many, many months. Absent any concrete diagnosis, he continued to search for the cause of the pain even though it was not yet apparent on film. He conceded that a blood test sometimes reveals findings of metastatic disease before it is disclosed by X-ray.
On January 28 he examined a chest X-ray, and while he still did not believe a diagnosis of the location of the primary carcinoma was warranted, he did observe a destructive lesion involving the right sixth posterior rib which was metastatic in character. He testified that four days later he no longer needed supporting evidence as to the manifestation of the metastatic process. In addition to this finding, he also located fibrotic streaking within the projection of the left second anterior interspace and adjacent third rib which appeared to be inflammatory.
With the biopsy and radiological report at his disposal, Dr. Mauriello finally concluded on February 1, 1956 that Celeste was a victim of adenocarcinoma. He said that the tangible findings of the biopsy, fortified by the patient's pain and medical history, made it "most, most probable" that he had a cancerous metastatic lesion in his back. He was unsure of the primary source of the cancer but suspected it was the prostate. He prescribed medication and X-ray therapy and was then "as positive as one could be" that the lesion was metastatic.
On February 2, 1956 Dr. Horowitz visited Celeste for the first time and gave him a complete physical examination. It was then, under his direction, that palliative *135 deep X-ray therapy was applied to the lumbar region. The treatment chart disclosed a diagnosis of metastatic adenocarcinoma to the spine, located the prostate as the probable location of the previous lesion and the spine, rib and skin as the location of the present lesion. Under his direction, 12 treatments of 200 or 300 roentgens each were administered. On February 15, 1956 the last treatment was completed with a notation that there had been some relief of the back pain.
During February there was some slight improvement in Celeste's condition. Nevertheless, Dr. Horowitz's re-examination of the posteroanterior and left lateral projections of the chest again disclosed a large destructive process involving the right sixth posterior region which was metastatic in character with a suggestion of pathological fracture through that rib. Additional X-rays taken on February 24 disclosed no essential changes in findings except that a small nodularity was seen at the level of the fourth left interspace. By the end of the month, even though there was less back pain, nodules had appeared on the patient's face, right cleidomastoid, right shoulder, left biceps, left triceps and over the left scapula, with swelling in the left leg.
By April further nodules had appeared on patient's chest and face, there was density at the left midlung and the destructive process had set in on his ribs. He was classified as a terminal patient on the 25th, and on the following day he died. The final diagnosis by Dr. Mauriello was a possible cancer of the thyroid with generalized metastasis. The death certificate stated the cause of death as metastatic adenocarcinoma. No autopsy was performed.
Dr. Mauriello testified that there was a strong probability that the metastatic lesion in the patient's back was aggravated or hastened by the lifting incident. At the time of Celeste's death, he had changed his opinion as to the locale of the primary cancer, believing then that there was some inconclusive evidence in favor of the thyroid. He further stated that the connection between the lifting and lesion *136 was "as perfect a history of cause and effect as any patient I have seen" and described the progress of the lesion as follows:
"This is the mechanism, as I see it, the spine is a supporting structure for the entire body. The spine is made up of several bones layer on layer just like a brick with cement in between each brick. Coming over the spine are ligaments and muscles that hold the spine, the hip bones and so on. Also, there are accompanying structures; vascular and nerve structures. If there is already an eaten-away process in the part of the spine upon which supporting structures depend, if these supporting structures are strained, it is very easy for me to see this already-begun destructive process is pulled, enlarged and hastened, which is the term I used."
On cross-examination Dr. Mauriello admitted that it was possible for one who has cancer in his back due to involvement in the vertebrae to develop back pain without trauma and that cancer of the lungs and thyroid can metastasize to bone without any strain or sprain. He also conceded that the pathological report supported a probable conclusion that metastasis was already present in the spine at the time of the September 1955 trauma. Nevertheless, he believed that the local area was worsened by the trauma. He further testified that the early negative X-rays of the spine did not rule out cancer, although the film did make him suspicious of the possibility of metastasis. Finally, he stated that the percentage of patients who have cancer with a primary site in the thyroid, lungs, kidneys or prostate, and who eventually develop metastasis in the spine or to bones, is "very high and especially with the biopsy report of adenocarcinoma."
Dr. Horowitz testified that Celeste had a clinical metastasis to the spine. In addition to the severe pain and rigidity in the spine and the X-ray finding of metastasis to the rib, the other clinical manifestations of cancer which he observed were multiple skin metastases on his face, chest, abdomen and breast. He conceded that X-ray of the lumbosacral area of the spine does not always disclose metastasis. As to the primary source of the cancer, his final impression *137 was that it was in the kidneys or the prostate. It was his experience that carcinoma of the thyroid metastasizes to the skull and long bones below the hip joint, but very rarely, to the spine. He testified that the appearance of this metastatic lesion in the back could mean that the primary cancer was in more than one locale.
Dr. Horowitz made the following remarks relating to organic activity in the bone when there is a blood test finding of high alkaline phosphatase:
"There is unusual activity of these normal cells which cause bone development and also those cells that cause normal clearing of debris away which is part of life's process and instead of being a normal even pattern it was highly accelerated which means there would be an extrinsic factor at work which was not part of normal bone process which caused the unusual activity and the extrinsic process points to a disturbance in bone growth with unusual osteoblastic activity resulting in high reading when you do this blood test."
On cross-examination he said that there was no direct or indirect X-ray manifestation of trauma in the lumbosacral area or in any other region in the back. He also said that had there even been a "severe" back injury, there would only be a "possibility" that the contour of the spine would be changed or that there would be signs of muscular spasticity. On redirect examination he added that the bones of the lumbar spine are the thickest bones in the body and it would be unusual to find any manifestation of a trauma in Celeste's bones.
Dr. Saul Lieb, an internist, had not treated Celeste during his lifetime but he did examine decedent's hospital records and his X-rays. His testimony indicated he was quite familiar with all the significant findings relating to decedent's medical history from September 1955 to the date of his death.
In response to a hypothetical question Dr. Lieb stated that Celeste died from the effects of a metastatic carcinoma, the site of the metastatic lesion being located in his spine. He said its primary source was immaterial but testified that "the most reasonable probable way of evaluating the medical *138 facts, * * * is that this man did have a metastasis to his spine at the time of the lifting episode." As a result of the lifting strain he incurred a sprained back and a stretching trauma to his lower back and spine that was "the competent-producing cause" of not only the weakening and aggravation of the spinal metastasis which caused the persistent pain, but also of the spread of the metastasis from his spine to the other parts of his body thereby accelerating his death. Dr. Lieb based his opinion on the facts that Celeste had persistent back pain from the time of the lifting incident until death; that he had an elevated phosphatase count which is consistent with bone metastasis; that the treating physicians were certain enough of metastasis that they directed their X-ray treatments to the bone site; that his own experience had demonstrated that metastasis exists in bone structure without such a condition's appearing on an X-ray until months after the destruction has begun.
After Dr. Lieb stated that trauma can and does spread cancer, he added:
"Now, obviously, someone like this man did have a lifting incident and he already has a back that is partially rotted away due to cancer and obviously lifting a heavy bolt such as described in there and followed with severe pain one cannot escape the conclusion there was a pathological destruction in his vertebrae that certainly such a lifting episode no matter what it did in producing a sprain must of necessity have aggravated and made more severe the destructive process that was already present."
He observed that even where a man is clinically well with no prior evidence of cancer and then receives a strain, there can be a spreading mechanism of the weakened metastasis through the open end blood vessel channels that seeds the disease in other parts of the body. He did admit, however, that it was possible for one with cancer in his back due to involvement in the vertebrae to develop back pain without any trauma.
Progressive's defense consisted principally of the testimony of four physicians.
*139 Dr. Robert J. Gross, a radiologist, reviewed Celeste's 1955 X-rays and testified that they revealed no evidence of trauma, metastasis or any abnormality except for some arthritic changes. While the January 1956 X-rays raised some suspicion of metastasis, he believed that that ailment could be definitely diagnosed from X-rays only on the basis of a chest film taken in April 1956, shortly before the patient's death. Based on the X-rays, he believed it "highly improbable" that the lifting episode caused any change or spread in the cancer. He noted that although direct trauma under certain circumstances could give rise to the formation of a malignant tumor, the fact remained that the tumor spread to the ribs, far away from the site of the trauma. As to the cause of death, he remarked:
"The strain occurred at a time when the inexorable natural course of the tumor was such that symptoms would appear and they would appear more and more as the disease took its natural inexorable course until a point was reached when he finally met his demise, but there certainly on the basis of the parts that we x-rayed [sic] was no indication that the part that he injured at any time was altered sufficiently or changed sufficiently to be a component part or to even suggest that this played any part in the way his tumor acted."
He acknowledged not being familiar with the decedent's hospital records.
Dr. Henry L. Jaffe, a pathologist, stated in response to a hypothetical question that Celeste died as a result of metastasis of an undetermined primary cancer to various parts of his body, including the skeletal region. He believed that the lifting episode did not have anything to do with either the origin or aggravation of the cancer, although he did agree essentially with Dr. Lieb's testimony in describing the course that cancer metastasizes inside the body. His testimony was substantially influenced, as was Dr. Gross', by the fact that the X-ray films taken after the trauma failed to reveal any injury to the bone structures of the lower spine either through tearing of the muscles or the ligaments. Nevertheless, he conceded that Celeste's case represented *140 "the normal course of events in a case of cancer, a case of carcinoma, the primary site of which was apparently never discovered and which in the course of time metastasized to various parts of the body. It invariably leads to death." Moreover, he also conceded that it is possible in cases of skeletal metastasis where the vertebrae and spine are involved that clinical X-ray pictures may not show any change in the bones from their normal appearance.
Dr. Charles A. Landshof, a specialist in internal medicine, testified that, at Dr. Mauriello's request, he examined Celeste on December 19, 1955 at the Medical Center. The results of this examination were not, however, contained in any record and he relied solely on his memory while testifying. At the compensation hearing, the witness stated that on the date he saw Celeste he attempted unsuccessfully to withdraw bone marrow from the sternum. This obviously was intended to be a biopsy. The record does not show that he ever again saw Celeste.
On the basis of his knowledge of the X-rays and hospital records, Dr. Landshof opined that Celeste had died of metastasized adenocarcinoma probably originating in the thyroid gland, but that the lifting incident only produced a strain and did not aggravate or cause his death. He, too, believed that the decedent had an adenocarcinoma on September 7, 1955, when he attempted to lift the roll of bengaline and that that condition caused his back pain until his death. On cross-examination, when confronted with the alleged fact that this was the first time Celeste had ever experienced this back pain, the witness claimed that this was merely coincidence. The doctor testified on cross-examination that the lifting episode did not do the metastatic structure "any good."
Dr. Milton Halpern, a pathologist and Chief Medical Examiner of New York City, agreed with Dr. Landshof both as to the cause of death and as to the failure of the lifting episode to be a contributing factor. He also in effect subscribed to the coincidence thesis. He added that:
*141 "It is more reasonable, I think, to conclude from the subsequent course of events that the man already had a malignant neoplastic disease, and that the strain or sprain at that time might have evoked symptoms, when those symptoms appeared. That is, sooner than they might otherwise have developed.
But the fact that this man had symptoms that developed at that time which may, in part, have been the result of the fact that he already had a tumor in his spine, or pelvis; that to me indicates that the development of the symptoms was eminent [sic]. But one cannot deny that those symptoms might have come on sooner as a result of this man lifting the heavy bale of silk that he was in the act of doing."
Dr. Halpern admitted that he had never treated a patient with a cancer similar to Celeste's and that "[I] don't hold myself out to be an authority on the treatment of cancer." He conceded that the first symptoms were "occasioned by this strain or sprain, or effort that this man underwent," while the progressive portion of the pain resulted from the cancer. He was unable to tell when the first episode of pain ceased and the second began.
The original petition by Celeste was for temporary and permanent disability benefits and was filed during his first admission to the Medical Center. After his death his widow filed a claim for dependency benefits. The two petitions were consolidated.
The County Court judge determined that Celeste suffered a stress or strain to his lumbosacral area which already had a metastatic lesion; that the trauma caused the hastening of the disease in his body with a rapid retrogression.
It has been settled that a work-connected aggravation of a pre-existing cancerous condition is compensable. Russo v. Wright Aeronautical Corp., 1 N.J. 417, 420 (1949), affirming 137 N.J.L. 346 (Sup. Ct. 1948); Ricciardi v. Marcalus Mfg. Co., 47 N.J. Super. 90, 101 (App. Div. 1957), reversed on other grounds 26 N.J. 445 (1958); Welch v. County of Essex, 6 N.J. Super. 184 (App. Div. 1950); Milne v. Atlantic Machine Tool Works, Inc., 137 N.J.L. 583 (Sup. Ct. 1948); Vorhees v. Schoonmaker, 86 N.J.L. 500 (Sup. Ct. 1914); O'Neill v. Babcock & *142 Wilcox, 19 N.J. Misc. 659, 662-3, 23 A.2d 116 (Dept. Labor 1941); Hofker v. Crocker-Wheeler Electric Mfg. Co., 18 N.J. Misc. 335, 13 A.2d 489 (Dept. Labor 1940); Zehrer v. H.H. Robertson Co., 17 N.J. Misc. 53, 57, 4 A.2d 854 (Dept. Labor 1939); Boehme v. Secaucus, 15 N.J. Misc. 454, 192 A. 94 (Dept. Labor 1937); 1 Larson's Workmen's Compensation Law (1952), § 12.20, p. 170.
There is no real dispute about the conclusion that Celeste was suffering from metastasis of an undetermined primary source when he lifted the end of the roll of bengaline. Medical witnesses for both parties so testified. The issue is whether the alleged trauma produced by lifting the material accelerated the spread of the metastasis. It is of no consequence that the resultant symptoms did not manifest themselves until some time after the strain. Joy v. Florence Pipe Foundry Co., 64 N.J. Super. 13, 23 (App. Div. 1960), affirmed 34 N.J. 67 (1961). Even so, there was testimony by Mastrofino, in addition to Celeste's own statement, that pain struck at once. Respondent neither denies this nor that there was a rapid increase of pain and eventual total physical deterioration.
The burden of proof is on the petitioner to justify an award for compensation. In determining whether petitioner has sustained the burden of proof the quality of the evidence required is probability rather than certainty. The burden is sustained if the tendered hypothesis is based upon the preponderance of probabilities. Epps v. Gold, 32 N.J. 344 (1960), affirming 61 N.J. Super. 355, 361 (App. Div. 1959); Januszewski v. Public Service Coordinated Transport, 9 N.J. 107, 114 (1952); Gilbert v. Gilbert Machine Works, Inc., 122 N.J.L. 533, 538 (Sup. Ct. 1939). This is of particular application when a medical problem is presented, opinions concerning which can only be based upon the degree of medical knowledge available to members of the medical profession at the time their opinions are voiced. Page v. Federated Metals Division, 71 N.J. Super. 59 (App. Div. 1961). Furthermore, it is sufficient for purposes *143 of the Workmen's Compensation Act that the employment be a necessary factor leading to the injury, not its sole or proximate cause. Cierpial v. Ford Motor Co., 16 N.J. 561, 566 (1954). The risk of a back injury was a reasonable incident to the decedent's duty to lift heavy rolls of material. As such, any attendant injury would arise out of and within the course of his employment. Cf. Lewis v. Walter Scott & Co., Inc., 50 N.J. Super. 283, 286 (App. Div. 1958).
In our examination of the record we have, of course, given greater weight to the testimony of Doctors Mauriello and Horowitz, the treating physicians. They were in a better position to express an opinion as to the cause and effect than respondent's medical experts. Joy v. Florence Pipe Foundry Co., supra (64 N.J. Super., at p. 24); Bialko v. H. Baker Milk Co., 38 N.J. Super. 169, 171 (App. Div. 1955), certif. denied 20 N.J. 535 (1956); Fusco v. Cambridge Piece Dyeing Corp., 135 N.J.L. 160, 162 (E. & A. 1947). It is quite clear from petitioner's medical testimony and the hospital records that Celeste's physicians had difficulty for some time in arriving at the nature of his illness. His first confinement at the Medical Center served only to raise a fairly strong suspicion in Dr. Mauriello's mind that Celeste was suffering from cancer. It is doubtful if Dr. Horowitz, at that time, had any wellfounded suspicions. But later Dr. Mauriello, who had observed and treated the cancer-ridden patient, had no hesitation in declaring that there was a causal relationship between the lifting episode and the aggravated metastatic lesion in Celeste's back. Where physical deterioration so closely follows an event competent to produce that effect, it is difficult to escape the inference of a causal connection between the two. Schust v. Wright Aeronautical Corp., 7 N.J. Super. 54, 58 (App. Div.), certif. denied 5 N.J. 177 (1950); Auten v. Johnston, 115 N.J.L. 71, 75 (Sup. Ct. 1935).
The testimony presented revealed that Celeste was in apparent good health prior to the accident, had worked *144 regularly, suffering only an occasional cold. He was unaware that he was a victim of cancer. Nevertheless, the employer takes his employees with their mental and physical defects or disabilities. Wexler v. Lambrecht Foods, 64 N.J. Super. 489, 500 (App. Div. 1960); Russo v. Wright Aeronautical Corp., supra (137 N.J.L., at p. 348); Marshall v. C.F. Mueller Co., 135 N.J.L. 75, 78 (Sup. Ct. 1946); 1 Larson, supra, § 12.20, p. 170 et seq. If the contributing or causative factors occur in the course of employment, it is not necessary that the consequent disability manifest itself at that time. Joy v. Florence Pipe Foundry Co., supra (64 N.J. Super., at pp. 22-3). While it is true he might and probably would have died of the disease in the normal course of events, nevertheless his serious physical impairment soon after the accident and the rapid progress of the disease makes a finding of cause and effect between trauma and acceleration of death a reasonable probability. Cf. Welch v. County of Essex, supra; Milne v. Atlantic Machine Tool Works, Inc., supra; Boehme v. Secaucus, supra.
Respondent's medical testimony advanced the theories that there was a possibility of coincidence between the lifting episode and the spread of cancer and that the continuous pain was only in part cancer-borne. But Doctors Landshof and Halpern, who advanced these theories, both diluted their effect by other testimony. Dr. Landshof conceded that the lifting episode was of no benefit to the latent metastatic area. Dr. Halpern, a pathologist, conceded that he had never treated a similar cancer patient, nor did he hold himself out to be an authority on the treatment of cancer. But he admitted the cancer symptoms might have appeared sooner because of the strain. In view of this testimony, we cannot find much probability in the hypothesis of coincidence. The testimony of respondent's experts lacked persuasiveness.
Moreover, Dr. Landshof was the only medical witness testifying on behalf of the respondent who ever saw Celeste. *145 He visited the patient at the request of Dr. Mauriello but made no report of his consultation in the hospital record. As a witness he relied solely on his own recollection of what occurred immediately before Celeste's first discharge from the Medical Center. Dr. Modero, who examined Celeste during the weeks immediately following the lifting episode, expressed no opinion about the cause of death, limiting himself to observing that the pain was disproportionate to a muscle strain.
The testimony of Dr. Gross was primarily based on a review of his X-ray studies. In light of the particular facts here present, an opinion based on Celeste's X-rays alone represented an insufficient foundation. Cf. Skupienski v. Maly, 27 N.J. 240, 246 (1958); Stanley Co. of America v. Hercules Powder Co., 16 N.J. 295, 305-7 (1954); Peer v. City of Newark, 71 N.J. Super. 12 (App. Div. 1961), certif. denied 36 N.J. 300 (1962). There was other testimony, including that of Dr. Jaffe, respondent's own witness, that it was possible not to discover skeletal metastasis in the spinal vertebrae area from an X-ray examination. Even if we were to consider Dr. Gross's evidence, this would considerably neutralize its effect.
From our review of the entire evidence and exhibits, especially in view of the enhanced weight which must be accorded petitioner's medical witnesses as treating physicians, we conclude that the burden of proving that Celeste's death arose out of and within the course of his employment has been established by the preponderance of the probabilities.
Affirmed.