160 N.J. Super. 393 (1978)
390 A.2d 137
IN THE MATTER OF FRANCINE SAFERSTEIN, VICTIM/DECEDENT, AND MICHAEL SAFERSTEIN, VICTIM/DECEDENT.
Superior Court of New Jersey, Appellate Division.
Argued March 13, 1978.
Decided July 3, 1978.
*394 Before Judges FRITZ, BOTTER and ARD.
Mr. Franklin J. Riesenburger argued the cause for appellant (Messrs. Greenblatt & Greenblatt, attorneys; Mr. Jay H. Greenblatt on the brief).
Mr. Bertram P. Goltz, Jr., Deputy Attorney General, argued the cause for Violent Crimes Compensation Board (Mr. John J. Degnan, Attorney General of New Jersey, attorney; Mr. William F. Hyland, former Attorney General of New Jersey, and Ms. Erminie L. Conley, Deputy Attorney General, of counsel).
The opinion of the court was delivered by FRITZ, P.J.A.D.
This is an appeal by the claimant from the denial of a claim by the Violent Crimes Compensation Board (Board). While the problem is said by the Board in its majority opinion to be the "first instance in which the Board has been faced with this question," whereby we consider it novel and important, we make note at the outset of the narrowness of the issue before us. In the words of the Board, that issue is "whether the Board as an administrative agency may or should make an independent finding by a preponderance of the evidence that a crime was in fact committed." In this connection we are also advised by that opinion that the Board has "heretofore relied on the determination by the police enforcement agency as to whether criminal conduct occurred." In the matter before us, by a majority opinion to which there was a forceful dissent, the Board "reaffirms its policy of relying on police determination *395 as to the presence of criminal conduct." The determination by the Board to make conclusive upon it the classification by police authorities as to the nature of the event (i.e., criminal or noncriminal) is the gist of this appeal.
The issue involved was brought into focus by the bizarre nature of the event involved. Mrs. Francine Saferstein and her 3 1/2-year-old son Michael, wife and son respectively of the claimant, were burned, grotesquely dismembered and fatally injured by a violent "high order explosion" at about 11 A.M. in front of a corner of the garage attached to their home. The tremendous force of the explosion was apparent not only from the horrible nature of the injuries but from the fact that debris was spread over a radius of about 400 feet. This was confirmed by the description in the police report of the damage:
* * * The crater was directly in front of the southeast corner of the garage, bordering the flower bed located to the left of the black macadam driveway. The crater was approximately three feet in diameter and eighteen inches deep. Chunks of the macadam were blown into the street and on the victim's front lawn. The force of the explosion moved three of the interior walls of the garage causing heavy damage to the dining room, kitchen and laundry room. All of the front windows of the house were blown in, as was the front door. The windows on the second floor and the east side first floor were intact [sic]. The soffits in the front of the house were also down. In the two car garage was a light green Ford LTD, N.J. registration RIU-195 with heavy blast damage to the trunk area and the rear undercarriage. On the north side of the garage were three metal garbage cans, plastic bags of garbage, near the laundry room entrance what was left of a cabinet. The garage was heavily littered with debris from the explosion. * * * Debris from the explosion was blown all over the neighborhood with most of it in the garage and front lawn area of the victim's house.
The claimant is Chief Forensic Chemist for the State Police. His testimony indicated that there were some chemicals in the attic of his home used in an experiment in a course in forensic science he taught at Trenton State College. He vigorously denied that these chemicals could have formed *396 an explosive mixture. He was equally vigorous in his denial that there were "any chemicals, anywhere in [his] house or in [his] garage or any other out buildings" which alone or in combination were explosive. He did concede the presence, in a white metal cabinet in the garage, of some chemicals in "micro-quantity" prepared in the study for his doctorate. In the course of the investigation Saferstein underwent a polygraph examination "to ascertain if he deliberately placed an explosive device at his home on May 30, 1973." The result was reported thusly: "The physiological reactions of the subject did not indicate any significant emotional disturbances indicative of deception when answering relevant questions pertaining to the object of the examination."
That which followed the explosion, not at all surprisingly, is described in the report of the Board's special investigator: "An intensive investigation was conducted by the Willingboro Twp. Police Dept. They were aided by the Burlington Co. Prosecutor's Office, N.J. State Police, the AT & F Division of the Treasury Department and the Dept. of the Army's Picatinny Arsenal." The intensity and thoroughness of the investigation, technical and otherwise, cannot be exaggerated.
The essence of the results of this thorough and professional investigation was uncertainty with respect to the precise nature of the explosive and only a little more than speculation as to precisely what happened, derived from such facts as particles of a fragmented milk carton found embedded in certain of the bones of Mrs. Saferstein. This uncertainty carried over to the expression of an opinion by the State Police with respect to the criminality vel non of the act producing the event.
Lieutenant John J. Toth, who commanded the Field Services Bureau of the State Police and testified at the hearing before the Board, frankly characterized the matter as "one of the most difficult cases we have ever come across." The substance of the opinion of the State Police with respect to the criminality aspect clearly appears in a question posed *397 by the chairman of the Board and answered by Lieutenant Toth 2 1/2 years after the event:
MR. JAHNKE: Everything you have done until now, everything that appears in these supplementary investigative reports, all the things that you have checked out, you still cannot come to a clear conclusion that it was a crime or not a crime?
THE WITNESS: No, we cannot at this time.
As noted above, the majority of the Board gave conclusive effect to this opinion and denied the claim. We are satisfied that in thus delegating to the State Police the decisional responsibility imposed on it by statute, the Board erred.
We are not insensitive to the argument that (1) N.J.S.A. 52:4B-11 defines as "offenses," by the use of words of art, the occurrences necessary to bring into play the invocation of its powers, and (2) this demonstrates legislative intent that there is necessary to Board jurisdiction the prior pronouncement of the happening of an "offense." This argument presumes that such a pronouncement is the natural responsibility of law enforcement authorities and so it is to them that the Board should look at the time of the seminal inquiry. We reject this argument for three reasons.
First, the statute clearly and plainly intends as compensable thereunder the results of certain acts which, because of stated disqualifications, cannot be classified as criminal offenses irrespective of that which law enforcement authorities might call them. N.J.S.A. 52:4B-10 (last paragraph).
Second, it is also clear that the Legislature intended the Board to be wholly independent of direction by other agencies. N.J.S.A. 52:4B-3.
Third, while the claimant has the burden of proof before the agency of all the elements entitling him to be compensated, that burden is met by a preponderance of the credible evidence rather than by the stricter penal rule of beyond a reasonable doubt. Certainly this is so when a claimant seeks redress from a third party, as in a workers' *398 compensation claim. Celeste v. Progressive Silk Finishing Co., 72 N.J. Super. 125, 142 (App. Div. 1962). When the State pursues a citizen in the administrative agency it does so with the advantage of the lesser burden. Atkinson v. Parsekian, 37 N.J. 143, 149 (1962); In re Darcy, 114 N.J. Super. 454, 458 (App. Div. 1971); State v. Owens-Corning Fiberglas Corp., 100 N.J. Super. 366, 392-393 (App. Div. 1968), aff'd o.b. 53 N.J. 248 (1969); Cooley's, etc., Foundation v. Legalized Games, etc., Comm'n 78 N.J. Super. 128 (App. Div. 1963), certif. den. 40 N.J. 213 (1963). We see no reason for a stricter rule simply because the State has elected by legislative enactment to become the target of a claim in the circumstances set forth in N.J.S.A. 52:4B-1. Yet it would appear, at least on the record before us, that the State Police, whose determination was given conclusive weight by the majority of the Board, refused to classify the event in question as a homicide because the proof did not satisfy that agency beyond a reasonable doubt that that crime was committed. The earliest questions asked by a Board member of Lieutenant Toth were as follows:
MR. KUSHINSKY: Maybe you can answer this question for us, why the State Police never classified this as a crime?
THE WITNESS: Well, because to this point in the investigation, there is  we have nothing to substantiate that it is in fact a homicide. We have nothin [sic] of any evidencial [sic] value that would indicate this to us without, you know, without any doubt that it was in fact a homicide.
MR. KUSHINSKY: Are you saying you don't have evidence beyond a reasonable doubt to establish?
THE WITNESS: That's correct.
Without implying agreement that the law enforcement agency itself need be satisfied by proof beyond a reasonable doubt, we hold that it is error for the Board to assign determinative effect to the conclusion of a law enforcement agency with respect to satisfaction of the requirements of N.J.S.A. 52:4B-11, i.e., criminality vel non.
*399 We should not be deemed to say that the members of the Board may not give substantial weight to the conclusions of the investigative law enforcement agencies, considered along with all the other evidence. Indeed, it is to be reasonably expected that they will. But the ultimate determination, articulated in specific findings and conclusions having respectable support in the record and the product of the Board, is the obligation of the Board uncontrolled by the determination of others. That this function is the duty of the Board, reasoning independently even with respect to the fact as to whether one of the crimes enumerated in N.J.S.A. 52:4B-11 has been committed, is also to be seen by the language employed by the Legislature in N.J.S.A. 52:4B-13: "To assist the board in determining the nature, extent or cause of personal injury or cause of death compensable under this act, the board [etc.] * * *." (Emphasis supplied.) It is apparent to us that the Legislature intended the Board to operate free of controlling influence even with respect to the criminality of the act involved.
Since this important component of the administrative process is missing here, we will not undertake to consider the proofs and determine the cause. This is to be correctly done by the agency in the first instance in accordance with the foregoing, and an expression from us would be premature.
We reverse the determination in the agency and remand for further proceedings. Since all the prior proceedings were apparently conducted by the Board pursuant to its "policy of relying on police determination as to the presence of criminal conduct," we believe the claimant and the Board should have an opportunity for the further presentation of evidence as either or both see fit. We see no reason, however, why the prior record should not be incorporated by reference in this remand hearing as a matter of expediency. Following these procedures, the Board shall issue findings of fact, conclusions of law and a determination, all consistent with the foregoing. We do not retain jurisdiction.